In the

# United States Court of Appeals
### For the Seventh Circuit

Nos. 99-2299, 99-2505, 99-2514, 99-2570,
99-2598, 99-2763, 99-2983, 01-1690

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

ABRAHAM HERNANDEZ, *et al.*,

*Defendants-Appellants*.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 CR 510—**Elaine E. Bucklo**, *Judge*.

ARGUED OCTOBER 15, 2002—DECIDED JUNE 3, 2003

Before POSNER, RIPPLE, and KANNE, *Circuit Judges*.

KANNE, *Circuit Judge*.

## I. History

In August 1995, the FBI, with the help of the Chicago
Police Department, began an investigation of a Chicago
street gang known as the Project Latin Kings. The authori-
ties suspected this gang, a subgroup of the much larger
Latin Kings gang, of operating a drug ring in the Chicago
Housing Authority's Lathrop Homes. The investigation
lasted over two years and resulted in the collection of a

substantial amount of evidence. As part of the investigation, several officers made undercover drug buys from members of the gang and conducted surveillance of the gang. The investigation also included the installation of a secret surveillance camera in a building down the street from where the Project Kings did much of their drug business. Over a six-month period, this camera produced a significant amount of video footage of gang members making drug sales. Further, three Project King members agreed to cooperate with the government investigation, providing valuable information about gang activities. Two of these informants wore body recorders when they went undercover, making audio tapes of gang meetings at which members discussed their narcotics business.

Based on the information obtained in this extensive investigation, on September 18, 1997, a federal grand jury returned a thirty-four count indictment charging twenty-one individuals with various drug offenses. Count 1 charged all defendants with conspiring to distribute cocaine base in violation of 21 U.S.C. § 846. Counts 2 and 3 charged five of the defendants with using minors in a drug operation in violation of 21 U.S.C. § 861. The remaining counts charged various individuals with substantive distribution offenses in violation of 21 U.S.C. § 841(a)(1). Several of the defendants pleaded guilty and cooperated with the government in the prosecution of the remaining defendants. In all, eight defendants went to trial: Antonio Rosario, Samuel Santana, Wilfredo Hernandez, Carl Stevenson, Roosevelt McMullen, Orlando Diaz, Abraham Hernandez, and Sandy Garvin.

At trial, the government produced a substantial amount of evidence explaining how the drug conspiracy worked. Former gang members, cooperating with the government, testified that the gang used force or the threat of force to keep anyone other than members of the Project Kings

from selling drugs in the Lathrop Homes. This allowed the gang members to sell drugs individually without competition from non-Project Kings. Further, they testified that on certain days, called "Nation Days," all members of the gang were required to sell crack cocaine and remit the proceeds to the gang's treasury. The profits from Nation Days were used to provide money to gang members in custody, to buy additional drugs and guns, to pay for gang apparel, and to fund parties and trips for gang members. Juan Hernandez, the gang's treasurer and a government witness, estimated that the Project Kings scheduled a Nation Day once or twice a week, and that the sales of cocaine on these days could produce three to four thousand dollars. In addition to this testimony, the video and audio tapes from the FBI investigation were played to the jury, allowing them to see drug transactions taking place and to hear the meetings at which the defendants planned their business. The government also produced ledgers that detailed the assignments that members were to perform on Nation Days. Also, officers and agents who participated in the investigation testified about their undercover dealings and their surveillance of the gang's drug activities.

At trial, the government introduced testimony explaining the role that the eight defendants on trial played in the drug ring. In 1995, Antonio Rosario was elected to the head position in the gang's hierarchy, called the "Inca." As Inca, he was responsible for appointing the other officers and for ensuring that the treasurer and the chief enforcers were doing their jobs. He also led "demos," gang meetings at which Nation Days were planned and other gang business was discussed. Samuel Santana held the position of "Cacique," the second in command. He occasionally led meetings and set Nation Days, and he attended demos to assist in planning Nation Days. Wilfredo Her-

nandez and Carl Stevenson were the gang's chief enforcers. They organized the security and lookouts on Nation Days, and they enforced the gang's rules by administering "punishments" for violations. Orlando Diaz, Roosevelt McMullen, and Abraham Hernandez worked as street sellers for the gang and performed security as well. Sandy Garvin was an older member of the Project Kings, a "Retired King." Because of his age he was not required to participate in Nation Days. The gang did, however, permit Garvin to sell drugs for his own benefit in the Lathrop Homes.

Following a four-week trial, the jury found each defendant guilty on at least some of the counts and the judge gave the defendants varying sentences. Rosario was found guilty as charged in Counts 1, 2, 3, and 20, and sentenced to 360 months imprisonment. The jury found Santana guilty as charged in Counts 1, 2, 3, 4, and 10, and he was sentenced to 240 months imprisonment. Wilfredo Hernandez was found guilty as charged in Counts 1 and 3, and sentenced to 360 months imprisonment. Stevenson was found guilty as charged in Counts 1, 3, 18, 19 and 21, and sentenced to 292 months imprisonment. The jury found Diaz guilty as charged in Count 1 of the indictment, and the judge sentenced him to 240 months imprisonment. McMullen was also found guilty of Count 1 and sentenced to 141 months imprisonment. Abraham Hernandez was found guilty of Count 1, but acquitted of Counts 23 and 24; he was sentenced to 151 months imprisonment. The jury found Garvin guilty as charged in Counts 20, 26, 28, and 31, but acquitted him of the conspiracy charged in Count 1. The judge sentenced Garvin to 262 months imprisonment. These eight defendants now challenge various aspects of their convictions and sentences. Ultimately, we reject all their arguments and affirm the sentences imposed by the district court.

## II. Analysis

### A. Evidentiary Rulings

Defendants first argue that they should be granted a new trial because the district court made erroneous rulings regarding the admission of evidence related to drug sales on days other than Nation Days and to incidents of gang violence perpetrated by the Project Kings. We give special deference to a trial judge's evidentiary rulings "because of the trial judge's first-hand exposure to the witnesses and the evidence as a whole, and because of the judge's familiarity with the case and ability to gauge the impact of the evidence in the context of the entire proceeding." *United States v. Van Dreel*, 155 F.3d 902, 905 (7th Cir. 1998). Consequently, we will reverse a decision on admissibility of evidence only if the trial court has "clearly abused its discretion," which typically occurs only "where no reasonable person could take the view adopted by the trial court." *United States v. Hughes*, 970 F.2d 227, 232 (7th Cir. 1992) (quotations omitted). Further, where the alleged error of admission occurred during the trial, as is the case here, we "will grant a new trial only if the error had a substantial influence over the jury, and the result reached was inconsistent with substantial justice." *United States v. Walton*, 217 F.3d 443, 449 (7th Cir. 2000) (quotations omitted). Defendants have not met this burden.

### 1. Evidence of Drug Sales on Non-Nation Days

Defendants argue that the district court erred by repeatedly admitting evidence of drug sales that either did not involve any of the defendants on trial or did not occur on Nation Days. This evidence, defendants argue, was outside the scope of the charged conspiracy and therefore irrelevant. Underlying this argument is an assumption that the charged conspiracy was limited to the sale of drugs on Nation Days. The government vigorously

challenges this assumption, arguing that the conspiracy charged was much broader.

The language in Count 1 of the indictment charges the defendants with a conspiracy to sell crack cocaine in the Lathrop Homes and to exclude other sellers through the use of violence. While this count does list the sale of narcotics on Nation Days as part of the conspiracy, it does not limit the charge only to those sales.

Defendants contend that, even though the indictment uses broad language, the trial judge ruled that the charged conspiracy related only to Nation Days. Our review of the record, however, reveals no such ruling. Each time an issue related to the scope of the charged conspiracy arose at trial the district judge either delayed ruling on it or admitted evidence of drug deals on non-Nation Days over defendants' relevance objections. The only instance in which the district court arguably determined that the conspiracy involved only Nation Days was at sentencing when the court looked only to the sales on Nation Days as relevant conduct. This determination at sentencing speaks to the scope of the conspiracy *proved* but says little about the scope of the conspiracy *charged*.[1]

---

[1] Defendants cite *United States v. Torres-Ramirez*, 213 F.3d 978, 983 (7th Cir. 2000), for the proposition that the findings of the district court at sentencing "reflect[ ] a considered judgment by the district court" about the scope of the agreement in which the defendants engaged. The cited phrase, however, is taken out of context. In *Torres-Ramirez*, we considered the findings at sentencing to be a "considered judgment" about what the evidence at trial *showed*. We did not hold or imply that a finding at sentencing amounts to any sort of judgment about what evidence was *relevant* at trial.

From the indictment and the judge's rulings at trial, it is clear that the conspiracy charged involved more than just sales on Nation Days; it also encompassed the gang's agreement to forcibly exclude non-Project King sellers and thereby to eliminate competition from outsiders. Thus, the district court did not abuse its discretion by allowing the government to produce evidence of sales on non-Nation days because this evidence was arguably relevant to the issue of whether the Project Kings excluded all sellers who were not members of their gang, and this issue was part of the charged conspiracy.

Even if we were to assume that the judge improperly admitted evidence of drug sales outside the charged conspiracy, remand for a new trial would not be appropriate because the error did not have "a substantial influence over the jury," nor was the result reached "inconsistent with substantial justice." *Walton*, 217 F.3d at 449. Defendants give the impression in their brief that the jury was overwhelmed with and hopelessly confused by irrelevant evidence of drug transactions on non-Nation days. This conclusion, however, is not borne out by the record. That the allegedly improper evidence did not substantially influence the jury is shown by its verdict with respect to Sandy Garvin. The government charged Sandy Garvin with conspiracy to distribute drugs even though it was clear that Garvin had no connection to the sale of drugs on Nation Days. It is apparent from the jury's verdict of not guilty on Garvin's conspiracy charge that they distinguished between Nation Days and non-Nation Days and accepted only the Nation Day sales as establishing the conspiracy. Therefore, we conclude that the jury was not overwhelmed and confused by non-Nation Day evidence.

In addition, the evidence of the conspiracy, at least as to Nation Days, was substantial; thus the conspiracy conviction was not inconsistent with substantial justice. The

video tape evidence showed defendants making numerous drug sales—some of which occurred on Nation Days—and the undercover police officers, who had purchased drugs from the gang on Nation Days, testified against defendants. The government also produced four former members of the gang who testified about the practices of the gang with respect to sales of drugs on Nation Days. And the jury heard audio tapes of the defendants at gang meetings discussing when to hold Nation Days, discussing the profits from Nation Days, and discussing various other elements of their narcotics business. Further, the jury viewed ledgers that showed when each of the defendants was scheduled to sell drugs or conduct security on Nation Days. Given this evidence, we decline to grant defendants' request for a new trial.

## 2. Gang Violence

Defendants next argue for a new trial based on the trial court's admission of evidence relating to violence perpetrated by defendants and other members of the Project Kings. Defendants acknowledge that "each time violence was introduced the district court expressed consternation," and in some cases ruled that such evidence could not be admitted. (Joint Br. 14). They argue, however, that despite the court's rulings the jury still heard significant amounts of evidence about gang violence and that the trial court abused its discretion in not granting them a new trial based on the jury's exposure to this evidence.

Even assuming that the jury was improperly allowed to hear evidence about violence, once again it is not at all apparent that the error "had a substantial influence over the jury." *Walton*, 217 F.3d at 449. The evidence of violence that did come in was comparatively slight in light of the length of this trial, which lasted four weeks and

produced a trial transcript nearly 3,300 pages long. Out of this large record, defendants point to only five instances where gang violence was mentioned. All of these references were brief (most of them consisting only of one sentence or less in the record) and were properly handled by the trial judge, either by sustaining a defense objection or by allowing the evidence in on a limited basis. Such meager references to violence could hardly have had a substantial influence on the jury's decision.

Further, we recently held that the trial court did not abuse its discretion by admitting evidence of violence in a similar drug conspiracy case. *United States v. Thompson*, 286 F.3d 950, 969 (7th Cir. 2002) (holding that the district court did not abuse its discretion by allowing in evidence that defendants had been involved in several shootings and an alleged kidnaping because it showed how members of the drug conspiracy conducted business); *see also United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999) (affirming admission of evidence of violence committed on behalf of drug conspiracy because it explained the mutual trust between coconspirators); *United States v. Molina*, 75 F.3d 600, 602 (10th Cir. 1996) (affirming admission of evidence of defendant's repossession of car at gunpoint because it showed his organizational role in the drug conspiracy); *United States v. Rodrequez*, 859 F.2d 1321, 1327 (8th Cir. 1988) (affirming admission of evidence that defendant beat a person with a pistol for failure to repay a loan because it showed how conspiracy operated). Thus, we see no way in which the admission of the violence evidence in question here could have produced a "result . . . inconsistent with substantial justice." *Walton*, 217 F.3d at 449 (quotations omitted). We find that the district court did not abuse its discretion by refusing to grant defendants a new trial.

**B. Lesser-Included-Offense Instruction**

Defendants next argue that the trial court erred by not instructing the jury that they could convict defendants of the lesser included offense of mere possession instead of the greater charge of possession with intent to distribute. At trial, when defendants requested the mere-possession instruction, the district court questioned whether there had been any evidence submitted to the jury which would support such an instruction. The court recalled that there was very little, if any, evidence that any of the defendants personally used drugs. Defense counsel responded that the proposed instruction was based only on possession and not necessarily use. The court then ruled that the lesser-included-offense instruction would not be given, stating that either defendants possessed the cocaine to use it or to distribute it and that there was no evidence of personal use presented. We review the trial court's refusal to give a lesser-included-offense instruction for abuse of discretion and therefore will reverse only "where no reasonable person could take the view adopted by the trial court." *Hughes*, 970 F.2d at 232 (quotations omitted).

We begin by noting that defendants are not entitled to a lesser-included-offense instruction "as a matter of course." *United States v. Wright*, 131 F.3d 1111, 1112 (4th Cir. 1997). Rather, it must be shown that evidence was presented at trial from which a rational jury could conclude that a person simply possessed narcotics and did not intend to distribute them. *Schmuck v. United States*, 489 U.S. 705, 716 n.8 (1989). Defendants rely almost solely on the fact that they were found in possession of a small amount of crack cocaine to support their argument for an instruction on simple possession. We agree with the Fourth Circuit's conclusion that the mere fact that a defendant possessed a small amount of cocaine "is simply insufficient alone to require the lesser-included offense instruc-

tion." *Wright*, 131 F.3d at 1113. Indeed, in the case before us, the record is devoid of any evidence that defendants possessed these drugs for any purpose other than to distribute them. Defendants rely heavily on the Fifth Circuit case of *United States v. Lucien*, 61 F.3d 366 (5th Cir. 1995), to establish that merely possessing a small amount of drugs warrants the district court to give a lesser-included-offense instruction. Even in that case, though, there was at least some argument made at trial—specifically, in the defense's examination of the government expert—as to whether the defendant there possessed the drugs for his own personal use. *See id.* at 375. Defendants here point to no place in the record where they even raised the issue of mere possession during trial. Indeed, they even conceded to the district judge that they were not arguing that they possessed the drugs for their own personal use, and no other reason for possessing them was given to the judge or produced at trial. In light of this complete lack of evidence to support a jury verdict of simple possession, we find that the district court did not abuse its discretion by refusing to give the lesser-included-offense instruction.

## C. *Bruton* Issue

Defendants, other than Carl Stevenson, next argue that their Sixth Amendment rights to confront adverse witnesses were violated by the admission of Carl Stevenson's post-arrest statement. At trial, Agent Anthony Thomas testified that Stevenson told investigators in a post-arrest interview that (1) he was a member of the "Project Kings" and served as the gang's enforcer, (2) the gang sold crack cocaine and held "Nation Days," and (3) disciplinary action was taken by the gang against "Latin Kings" for not working on Nation Days. The trial judge instructed the

jury that they should consider the statement only as evidence against Stevenson and not against any of the other defendants. Despite the instruction, defendants objected to the admission of the statement, arguing in reliance on *Bruton v. United States*, 391 U.S. 123 (1968), that their Confrontation Clause rights were violated because the statement implicated them in the conspiracy by referring to "Latin Kings," "Project Kings," and "Nation Days."

We review evidentiary rulings that impact the Sixth Amendment right to confront witnesses *de novo*. *United States v. Castelan*, 219 F.3d 690, 694 (7th Cir. 2000). We begin by noting, as the Supreme Court did in *Richardson v. Marsh*, that there is "an almost invariable assumption of the law that jurors follow their instructions," and that *Bruton* "recognized a narrow exception to this principle." 481 U.S. 200, 206-07 (1987). In the *Bruton* case, the government introduced the confession of Evans, Bruton's co-defendant. Evans's confession plainly stated that he and Bruton had committed the crime charged. *Bruton*, 391 U.S. at 124-25. Because Evans was a co-defendant and did not testify, Bruton had no opportunity to cross-examine him and test this confession, which obviously implicated him as well as Evans. The Court held that a defendant's Confrontation Clause rights are deprived when a confession of a nontestifying defendant that also "expressly implicates" a co-defendant is admitted, even when the jury is instructed to consider the statement only as evidence against the declarant. *Id.* at 124 n.1, 135-36; *see also Richardson*, 481 U.S. at 208.

Since *Bruton* the Supreme Court has further defined the doctrine. In *Richardson*, the Court made clear that some confessions by co-defendants could be admitted if they were sufficiently redacted so that they did not facially

incriminate other defendants. 481 U.S. at 211. The *Richardson* Court noted that where a confession does not directly refer to a co-defendant, and implicates that co-defendant only by inferences drawn from other evidence in the trial, the chances that the jury will disregard or be unable to follow the judge's limiting instruction are significantly diminished. *Id*. at 208. In *Gray v. Maryland*, however, the Court clarified that *Bruton* problems are not avoided simply by deleting from a confession the co-defendant's name or by merely inserting in place of the co-defendant's name a symbol, such as the word "deleted." 523 U.S. 185, 197 (1998). The Court noted that this insert was actually "facially incrimin[ating]" because the word "deleted" still pointed to specific people. *Id*. at 196-97.

After *Richardson* and *Gray*, it is clear that a redacted confession may be admitted as long as the redaction does not obviously refer to the co-defendants. The determination of when a term obviously refers to a co-defendant may not always be easy to make. In *Gray*, however, the Court insinuated that one-to-one correspondence between the inserted terms and the co-defendants at issue makes the reference more obvious and thus more problematic. That this was a primary concern is seen in the Court's suggestion of a possible way the Government could have avoided the *Bruton* problem:

> The witness who read the confession told the jury that the confession (among other things) said,
>
> > "Question:  Who was in the group that beat Stacey?"
> >
> > "Answer: Me, deleted, deleted, and a few other guys."
>
> Why could the witness not, instead, have said:
>
> > "Question:  Who was in the group that beat Stacey?"
> >
> > "Answer: Me and a few other guys."

*Gray*, 523 U.S. at 196. According to the *Gray* Court, the "deleted, deleted" redaction too clearly referred to the other two participants, one of whom had died and the other of whom was the defendant. *Id.* at 188, 194.

In decisions since *Gray* and *Richardson*, we have used this one-to-one correspondence as a factor in our efforts to determine if the redacted confession too obviously refers to the co-defendants. For instance, in *United States v. Hoover*, a case on which defendants rely heavily, we held that substituting "incarcerated leader" and "unincarcerated leader" for the names of two defendants did not solve *Bruton* problems because those terms were "obvious stand-ins" for the names of the defendants. 246 F.3d 1054, 1059 (7th Cir. 2001). Our reasoning there relied in part on the fact that this sort of redaction did not "avoid[ ] a one-to-one correspondence between the confession and easily identified figures sitting at the defense table." *Id.*

In the case now before us, the one-to-one correspondence that was present in *Bruton*, *Gray*, and *Hoover* does not exist. Rather, there is only an unspecified mention of a group of people, the "Latin Kings."[2] We note that this one-to-one analysis is probably not dispositive of the issue in every case, but it is at least an important factor to con-

---

[2] We note there was some speculation by the parties before trial began as to whether the statement might include more specific references to the Inca and Cacique (both titles of specific people in the Latin King gang). (Tr. 14-16). But at trial when the testimony was presented to the jury no references were made to the Inca or Cacique, (Tr. 163-74); thus, there is no issue here as to whether those references might have presented *Bruton* problems.

sider in determining whether the redaction obviously refers to any of the co-defendants on trial.

Here, we do not find the use of the terms "Project Kings," "Latin Kings," or "Nation Days" to be overly obvious. Given that the indictment named twenty-one Project Kings as defendants in this conspiracy there is little chance that the jury would equate any reference to "Latin Kings" or "Project Kings" with the eight defendants actually on trial. Further, the Latin Kings is an extremely large gang that has components in many parts of Chicago and indeed all over the country. In the jury's mind, the reference to "Latin Kings" could well refer to any number of other Latin Kings. Likewise, "Project Kings" referred to a sub-group of the Latin Kings, which was much larger than the eight defendants on trial. And it is not clear how the reference to Nation Days directly implicates any of the defendants. None of these terms can be said to serve as "obvious stand-ins" for the co-defendants.

The situation here is much like the one we addressed in *United States v. Stockheimer*, 157 F.3d 1082, 1086 (7th Cir. 1998). In that case, one defendant stated that an "inner circle of persons" was responsible for the crimes committed. *Id*. Two co-defendants objected to this statement, arguing that it implicated them because of the use of the phrase "inner circle." *Id*. (citations omitted). We rejected the defendants' contention, noting that even if we assumed that "the jury immediately concluded that . . . the other defendants . . . belonged to the inner circle . . . [n]evertheless, [the] statements do not 'facially incriminate' these defendants." *Id*. (citations omitted). The same is true in the case now at bar. The references here simply do not directly or obviously incriminate these defendants.

Even if a *Bruton* error did exist here, we would find, as we did in *Hoover*, that such error was harmless. *Hoover*,

246 F.3d at 1059-60. As discussed above, the evidence of a narcotics conspiracy in this case was substantial. Given this surplus of damning evidence, we find it implausible that Stevenson's statement, which only mentioned the vague terms "Project Kings," "Latin Kings," and "Nation Days," had any substantial impact on the jury's ultimate conclusion.

### D. Use of Minors

Defendants Rosario and Santana were charged with and convicted of using minors to sell drugs in violation of 21 U.S.C. § 861(a)(1).[3] Defendants Rosario, Santana, Stevenson, and Wilfredo Hernandez were charged with and convicted of using minors to avoid apprehension for illegal drug sales in violation of 21 U.S.C. § 861(a)(2).[4] On appeal, they challenge various aspects of these convictions.

---

[3] "It shall be unlawful for any person at least eighteen years of age to knowingly and intentionally—

> (1) employ, hire, use, persuade, induce, entice, or coerce, a person under eighteen years of age to violate any provision of this subchapter or subchapter II of this chapter."

21 U.S.C. § 861(a)(1) (2003).

[4] "It shall be unlawful for any person at least eighteen years of age to knowingly and intentionally—

> (2) employ, hire, use, persuade, induce, entice, or coerce, a person under eighteen years of age to assist in avoiding detection or apprehension for any offense of this subchapter or subchapter II of this chapter by any Federal, State, or local law enforcement official."

21 U.S.C. § 861(a)(2) (2003).

### 1. Bill of Particulars

Before trial, the defendants filed a motion for a bill of particulars that would have compelled the government to identify the minors who were allegedly used. The district court denied defendants' motion, holding that the indictment and the discovery materials provided sufficient information from which the defendants could reasonably anticipate the evidence that the government would introduce at trial.

Whether to require a bill of particulars rests within the sound discretion of the district court, and we will reverse a district court's decision to deny a bill of particulars "only when the trial court clearly abuses its discretion." *United States v. McAnderson*, 914 F.2d 934, 946 (7th Cir. 1990) (quotations omitted). That is, unless it is clear that "no reasonable person could take the view adopted by the trial court," we will not disturb the trial court's decision. *Hughes*, 970 F.2d at 232 (quotations omitted). Further, we have stated that to overturn a denial of a bill of particulars, a defendant must suffer "actual prejudice from the denial." *McAnderson*, 914 F.2d at 946.

In *United States v. Kendall*, we held that a bill of particulars was unnecessary where the indictment sets forth the elements of the charged offenses and provides sufficient notice of the charges to enable the defendant to prepare his defense. 665 F.2d 126, 134-35 (7th Cir. 1981). We further held in *United States v. Canino* that a bill of particulars is not required when the information a defendant needs to prepare his defense is available through "some other satisfactory form," such as discovery. 949 F.2d 928, 949 (7th Cir. 1992) (citing 1 WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 129, at 436-38 (1982)). There is little doubt here that the indictment set out the elements of the charged offenses. Defendants argue, however,

that without the names of the minors they could not adequately prepare their defense.

We find that the district court did not abuse its discretion in refusing to require a bill of particulars because the names of the minors were available through discovery. Among the relevant discovery material was a summary of the testimony involving juvenile Jose Hernandez, ledgers showing that specific juveniles were scheduled to provide security and sell drugs on certain Nation Days, and transcripts of the audio tapes on which references to "shorties" (a term that referred to minors) were made.[5] In light of these discovery materials, it was not an abuse of discretion for the district court to hold that defendants could reasonably anticipate the evidence the government would produce at trial and adequately prepare their defense based on this evidence.

Defendants also claim that their due process rights were violated because they had no notice of who the minors were. The argument is largely undeveloped and amounts to little more than bald assertions. They rely on the fact that during the jury instruction conference the government sought to introduce birth certificates and other information about particular minors, of whom the defendants claim they received no notice. Defendants assert that they were prejudiced by this surprise and their corresponding lack of preparation to argue the point; however, the argument is unavailing in light of the fact that the court ruled in favor of the defendants and did not allow the

---

[5] We note that the defendants' entitlement to receive the names of the minors referred to as "shorties" is tenuous; since the government did not know the names of these minors either, it would have been impossible to provide these names to defendants.

information concerning these minors to be admitted. Discovery provided defendants with notice of all of the minors to whom the government actually referred at trial. Therefore, we find no due process violation.

### 2. Sufficiency of Evidence on Counts 2 and 3

Defendants next contend that there was insufficient evidence to convict them of using minors as charged in Counts 2 and 3 of the indictment. We have noted before that the hill one must climb in a sufficiency-of-evidence claim is exceedingly steep. *United States v. Frazier*, 213 F.3d 409, 416 (7th Cir. 2000). We view all the evidence in the light most favorable to the prosecution and reverse the jury's verdict only where the record is devoid of any evidence, regardless of how it is weighed, from which a jury could find the defendants guilty beyond a reasonable doubt. *United States v. Johnson*, 26 F.3d 669, 684 (7th Cir. 1994).

As stated above, § 861(a) makes it a crime to "knowingly and intentionally" (1) use a minor to violate the narcotics laws or (2) use a minor to assist in avoiding detection of a violation of the narcotics laws. 21 U.S.C. § 861(a) (2003). Defendants concede that the government did not have to prove that the defendants knew that the people they were using were minors. *See Frazier*, 213 F.3d at 419 (holding that knowledge that the person used is under the age of eighteen is not an element of the statute). Defendants also do not argue, nor could they, that there was insufficient evidence to show that minors were used as part of this drug conspiracy.[6] What defendants do argue

---

[6] The evidence introduced included testimony by Juan Lorenzana, who was a minor for at least part of the period of the conspiracy, that on weekly Nation Days he both sold drugs and served as

(continued...)

is that while there may have been evidence that minors were being used to sell drugs and avoid detection there is no evidence that *these defendants* "knowingly and intentionally" employed the minors in the drug conspiracy. Basically, they contend that there is nothing which links *them* to the use of minors; however, the evidence shows otherwise.

The two defendants charged in Count 2—using a minor to violate narcotics laws—were Rosario and Santana, the number one and number two people in this gang. And the four defendants charged in Count 3—using a minor to avoid detection of narcotics laws violations—included not only Rosario and Santana, but also Stevenson and Wilfredo Hernandez, the leaders of the gang's security component detail. Given the nature of this drug conspiracy and gang it is doubtful that the gang's leaders were not "knowingly and intentionally" employing the people who worked under them. We recognize, however, that in some situations people serving in a leadership capacity do not always know who works for them. *See United States v. McDonald*, 877 F.2d 91, 93 (D.C. Cir. 1989) ("A reasonable jury could not conclude beyond a reasonable doubt, from McDonald's role as supplier alone, that McDonald was knowledgeable of all operations at the [drug] house and therefore used Pinkney within the meaning of [section 861(a)]."). In defendants' case, however, it was not merely the fact that they were the leaders of the drug conspiracy that linked them to the minors. Rather, at trial, audio tapes of these defendants at gang "demos"—meetings

---

[6] (...continued)
a lookout for police. Also, both Juan Lorenzana and Juan Hernandez testified that Jose Hernandez, a minor during the whole period of the conspiracy, worked security and directed drug customers on Nation Days.

where the gang leaders discussed the details of Nation Days—were played into evidence. On one of these tapes, Wilfredo Hernandez is heard directing "shorties" to go into a courtyard and watch for police while the leaders discussed business. On another tape, Stevenson is heard complaining that shorties were not properly performing their security duties. Finally, on the tape of another demo, at which Santana and Wilfredo Hernandez were present, the jury heard Rosario discussing the benefits of using shorties in gang activities because juveniles faced more lenient penalties if caught than did older members. These tapes provide substantial evidence that these defendants knowingly and intentionally used minors as charged in Counts 2 and 3.

Defendants point to another tape on which Rosario is heard ordering that no shorties were to be used on a particular Nation Day. They argue that this tape shows that the leaders of the gang condemned the use of minors in drug transactions. But viewing this evidence in the light most favorable to the government, as we must, the jury could have rationally interpreted this statement as showing that the leaders of the gang were in direct control of when and how minors were used, and that sometimes they chose to use minors and sometimes they chose not to use them. This interpretation makes reasonable sense of this tape in light of the other tapes and testimony, which showed that the leaders did sometimes direct minors to participate in the drug conspiracy.

In sum, given the comments made on the audio tapes by these defendants about the use of minors, given the testimony of the minors themselves about their activities in the conspiracy, given the fact that these defendants were the leaders of the conspiracy, and given the testimony of the gang's treasurer, Juan Hernandez, that the gang used minors to sell drugs and avoid detection, we find that a

rational jury could have concluded that these defendants were knowingly and actively employing minors in their drug conspiracy. The sufficiency of evidence challenge fails.

### 3. Sufficiency of the Indictment on Count 3

Defendant Stevenson argues that his conviction on Count 3 must be overturned because the indictment did not allege any *mens rea* and thus fails to charge an offense.[7] Stevenson failed to raise this argument below; therefore, we review it here only for plain error. Stevenson attempts to avoid the plain error standard of review by arguing that an indictment that negates an element of the offense fails to confer subject-matter jurisdiction on the district court; thus, we should consider the question of jurisdiction *de novo*. Stevenson's argument fails, however, because 18 U0.S.C. § 3231 confers jurisdiction on district courts to try charges framed by federal indictments, and, as we have repeatedly held, "district judges *always* have subject-matter jurisdiction based on *any* indictment purporting to charge a violation of federal criminal law . . . so errors in a non-frivolous indictment do not strip the district court of jurisdiction under § 3231." *United States v. Bjorkman*, 270 F.3d 482, 490 (7th Cir. 2001). Consequently, the issue is not jurisdictional and plain error applies. Plain-error review of the sufficiency of an indictment is an extremely difficult standard to overcome because we will reverse only if the indictment "is so obviously defective

---

[7] Count 3 of the indictment charged Stevenson with violation of § 861, alleging that he "employed, hired, used, induced and enticed" minors to assist in avoiding detection of violations of the drugs laws. Section 861, however, contains the *mens rea* "knowingly and intentionally," which was omitted from the indictment.

as not to charge the offense by any reasonable construction." *United States v. Wabaunsee*, 528 F.2d 1, 2 (7th Cir. 1975) (quotations omitted).

In *United States v. Smith*, we decided the identical issue that Stevenson raises here. 223 F.3d 554, 570-72 (7th Cir. 2000). In that case, Smith was charged with a violation of § 861(a). *Id.* at 571. The indictment in that case likewise failed to specify any *mens rea* element. *Id.* And the defendant there raised the same issue that Stevenson does here. We rejected the argument, holding that the scienter requirement was present in the context of the indictment in the words "employ," "hire," "use," "induce," and "entice," *id.* at 572,[8] the same words used in the indictment here. These words sufficiently convey the notion of knowledge and intent, so it cannot be said that this indictment fails to "charge the offense by any reasonable instruction." *Wabaunsee*, 528 F.2d at 2. Stevenson urges us to overrule our decision in *Smith*, but offers us no compelling reason to do so. Consequently, his sufficiency-of-the-indictment challenge fails.

### 4. Jury Instructions on Count 3

In a related argument, Stevenson claims that the district court gave a flawed jury instruction on Count 3 and that this error warrants reversal of his conviction on the count. In relevant part, the trial judge instructed the jury that in order to find a defendant guilty on Count 3, it

---

[8] In *Smith* we focused especially on the words "induce" and "entice" as conveying the idea of intention, stating "it seems to us impossible to . . . 'induce' or 'entice' a person to take those actions, without the necessary *scienter*. The ideas of purpose, knowledge, and intent are inherent in those words." *Smith*, 223 F.3d at 572.

had to find that "the defendant knowingly employed or used a person or persons to assist in avoiding detection and apprehension for the narcotics conspiracy." (Tr. 3218-19). As the government concedes, this instruction erroneously omitted the word "intentionally." This error, at least facially, gave the jury a lower *mens rea* requirement than that required by § 861, which provides that defendants must have acted "knowingly and intentionally." 21 U.S.C. 861(a) (2003).

Obviously, the omission of part of the *mens rea* requirement of a statute is a serious flaw; however, because no defendant objected to the jury instruction at the trial level, we review the issue only for plain error. Again, under the plain-error standard, we will reverse the district court's error only if it is clear or obvious and "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Cusimano*, 148 F.3d 824, 828 (7th Cir. 1998) (citing *Olano*, 507 U.S. at 736).

We note that Stevenson's argument on the jury-instruction issue was not addressed in the *Smith* decision discussed above. In *Smith*, we specifically noted that "[p]erhaps one might 'employ,' 'hire,' or 'use' a person to . . . assist in avoiding detection without criminal intent . . . [but] it seems impossible to take the next step, which is to 'induce' or 'entice' a person to take those actions, without necessary *scienter*." *Smith*, 223 F.3d at 572. In the jury instruction here, neither "induce" nor "entice" were used; rather the jury was told that Stevenson only had to "employ[ ]" or "use[ ]" minors to violate the statute. Also unlike the jury instruction in *Smith*, however, the court here *did* include the word "knowingly." Thus, we are presented with the issue of whether the terms "employ" or "use" along with the *mens rea* term "knowingly" are sufficient to convey the requisite criminal intent of the statute—a question that we did not have to address in *Smith*. *Id*. at 572.

We find that the instruction given to the jury sufficiently encapsulated the idea of purpose and intent to avoid reversal under the plain error standard.[9] Our reading of the instruction leads us to the conclusion that if Stevenson "knowingly" used kids in connection with the drug offenses that this use almost had to have been intentional. He knew these kids were minors and he knew that he was using and employing them to avoid detection of drug offenses. Put another way, it is difficult to see how he could knowingly but unintentionally "use" and "employ" a minor in these drug offenses. Consequently, we find that where a jury instruction includes the *mens rea* term "knowingly" but errantly omits the word "intentionally," that jury instruction is not so flawed as to work substantial injustice, at least where the instruction also uses the words "employ" and "use."[10]

## E.  *Apprendi* **Arguments**

In *Apprendi v. New Jersey*, the Supreme Court held that any fact, other than a prior conviction, "that increases the penalty for a crime beyond the prescribed statutory maxi-

---

[9]  We note that this obviously would be a much closer question under a lower standard of review, but we reserve deciding that issue until another day.

[10]  Stevenson additionally claims that he is mentally retarded, so the omission of the word "intentionally" produced an even greater prejudicial effect because the jury was not given the opportunity to consider whether he had the mental capacity to even commit this crime. However, no evidence of Stevenson's retardation was ever presented to the jury. Further, we do not find that his mental capacity affects our reasoning that the instruction given sufficiently conveyed the notion of "knowledge and intent."

mum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. 466, 490 (2000). All defendants, except Stevenson, argue that the sentences they received violated *Apprendi* because the trial judge, rather than the jury, determined the amount of drugs involved for sentencing purposes. Only Santana raised the *Apprendi* issue below, so his challenge is reviewed *de novo*; the rest of the defendants' arguments on this issue will be reviewed for plain error. We ultimately reject all defendants' *Apprendi* claims, but we will address them in three separate groups given the different standards of review and the different reasons for affirming their sentences.

### 1. Santana's *Apprendi* Claim

In the parts relevant to this case, the federal narcotics statute first lists that the "unlawful acts" covered include knowingly or intentionally possessing drugs with the intent to distribute them. 21 U.S.C. § 841(a). Section (b) of the statute then sets different maximum and minimum penalties that vary primarily on the basis of the quantity and type of the drugs involved. 21 U.S.C. § 841(b). When, as here, crack cocaine is the drug of conviction, section (b) provides for the following sentences:

> Section 841(b)(1)(A): persons committing offenses involving 50 or more grams of crack cocaine shall receive a minimum of 10 years imprisonment and a maximum of life; and if the defendant has a prior felony drug conviction then the sentence shall not be less than 20 years or more than life.

> Section 841(b)(1)(B): persons committing offenses involving 5 or more grams of crack cocaine shall receive a minimum of 5 years and not more than 40 years imprisonment; and if the defendant has a prior fel-

ony drug conviction the sentence shall not be less than 10 years or more than life.

Section 841(b)(1)(C): persons committing offenses involving an undetermined amount of crack cocaine shall not receive more than 20 years imprisonment; and if the defendant has a prior felony drug conviction the sentence shall not exceed 30 years.

21 U.S.C. § 841 (2000).

The jury instructions given in this case did not require the jury to find a drug quantity; thus, the jury convicted Santana, and the other defendants, of conspiring to possess and distribute an unspecified amount of crack cocaine. At Santana's sentencing, the judge determined by a preponderance of the evidence that Santana was responsible for 144 grams of crack cocaine, which corresponded to a sentencing-guideline range between seventeen and one-half years and twenty-two years (210-262 months). The judge then sentenced Santana to 20 years, relying on § 841(b)(1)(A)'s mandatory minimum of 20 years for defendants, like Santana, with prior felony drug convictions who commit offenses involving more than 50 grams of crack cocaine. Santana argues that this sentence violates *Apprendi* because it was the judge, rather than the jury, that determined the quantity of drugs involved and because the judge's determination led to the imposition of a mandatory minimum that was not warranted by the findings of the jury. We reject Santana's argument because we find it to be precluded by cases in this Circuit and by recent Supreme Court precedent.

The *Apprendi* decision makes clear that its application does not extend to situations where a defendant's sentence does not exceed a prescribed statutory maximum. 530 U.S. at 487 n.13 (noting that it was not overruling *McMillan v. Pennsylvania*, 477 U.S. 79 (1986), because

the *Apprendi* decision did not impact "cases that do not involve the imposition of a sentence more severe than the statutory maximum for the offense established by the jury's verdict"); *see also United States v. Williams*, 238 F.3d 871, 877 (7th Cir. 2001) ("[T]he rule of *Apprendi* is not implicated when the actual sentence imposed is less severe than the statutory maximum."). We have repeatedly stated that in drug cases, *Apprendi* has no application where a drug dealer is given a sentence at or below the maximum provided in § 841(b)(1)(C).[11] This is the case because a conviction under § 841(b)(1)(C) does not require any drug quantity to be found by the jury. Santana had a prior felony drug conviction so the maximum sentence he could receive under § 841(b)(1)(C) was 30 years imprisonment. He received a sentence of only 20 years; therefore, there was no *Apprendi* violation.

Santana attempts to avoid this conclusion by arguing that *Apprendi* was violated in his case because he was sentenced to a mandatory minimum under § 841(b)(1)(A).

---

[11] For just of few examples of cases where we have so held see *United States v. Collins*, 272 F.3d 984, 987 (7th Cir. 2001) ("*Apprendi* is violated here only if Mr. Collins' sentence exceeds the statutory maximum permitted by the evidence proved beyond a reasonable doubt before the jury and by his prior conviction."); *United States v. Duvall*, 272 F.3d 825, 830 (7th Cir. 2001) ("Duvall's 30-year sentence does not exceed the maximum allowed under § 841(b)(1)(C) when there is a prior felony drug conviction, so there is no violation of *Apprendi*."); *United States v. Brough*, 243 F.3d 1078, 1079-80 (7th Cir. 2001) ("[I]f (for example) [the offense involves] cocaine or heroin, then any penalty up to 20 years is lawful even if the jury does not find a particular quantity, because 20 years is the maximum under § 841(b)(1)(C) for unlawfully distributing any detectable quantity of any Schedule I or II controlled substance.").

According to Santana, *Apprendi* should apply to mandatory minimums, meaning that a defendant could not be sentenced to a mandatory minimum unless the facts triggering that minimum were proved to the jury beyond a reasonable doubt.

In *United States v. Williams*, we addressed the exact argument made by Santana. 238 F.3d 871 (7th Cir. 2001). There, defendant Williams was convicted of possessing crack cocaine with intent to distribute. *Id.* at 873. Just as in Santana's case, the judge, rather than the jury, determined the amount of drugs involved (60.4 grams) and sentenced Williams to the corresponding mandatory minimum under § 841(b)(1)(A)—ten years in that case because Williams had no prior conviction. *Id.* at 874. On appeal, Williams argued that *Apprendi* had been violated because the court relied on § 841(b)(1)(A)'s mandatory minimum without submitting the issue of drug quantity to the jury. We held that *Apprendi* did not apply because regardless of the district court's application of a mandatory minimum, Williams was still sentenced to a term below the statutory maximum provided in § 841(b)(1)(C). *Id.* at 877. We have no inclination to overrule *Williams* today, especially in light of the Supreme Court's recent decision in *Harris v. United States*, 122 S. Ct. 2406 (2002).

In *Harris*, the Supreme Court held that *Apprendi* did not require facts which might increase the mandatory minimum sentence to be proven to a jury beyond a reasonable doubt. *Id.* at 2420. Santana attempts to distinguish *Harris* by arguing that it involved 18 U.S.C. § 924 (use of a firearm in relation to crime of violence or drug

trafficking),[12] rather than the federal narcotics statute at issue here. *Id.* at 2410-11. Santana notes that § 924 contains only mandatory minimums and does not have mandatory maximums, whereas 21 U.S.C. § 841(b)(1) has both minimums and maximums. According to Santana, the distinction is important because under § 841, the single fact which determines the maximums also fixes the statutory minimums; consequently, when a fact is determined that raises the mandatory minimum it also raises the maximum penalty to which a defendant is exposed. Thus, in Santana's view, that fact must be submitted to the jury. While there is some logic to the argument, we do not find this reasoning persuasive nor do we see that *Harris* necessarily allows such a conclusion. Santana never addresses the fact that his actual sentence never came within *Apprendi's* stated confines—that is, his sentence did not exceed the maximum sentence allowable under § 841(b)(1)(C). We believe that the holding in *Harris*—that *Apprendi* does not apply to the mandatory minimums of 18 U.S.C. § 924(c)(1)(A)—only reinforces the basic principle that "*Apprendi* is violated . . . only if [a

---

[12] 18 U.S.C. § 924 states, in relevant part:

[A]ny person who, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime—

(i) be sentenced to a term of imprisonment of not less than 5 years;

(ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and

(iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

18 U.S.C. §924(c)(1)(A).

defendant's] sentence exceeds the statutory maximum permitted by the evidence proved beyond a reasonable doubt before the jury and by his prior conviction." *Collins*, 272 F.3d at 987. We reiterate that here, the evidence proved beyond a reasonable doubt to the jury was that Santana possessed and intended to distribute an unspecified amount of crack cocaine. The statutory maximum set by § 841(b)(1)(C) for this crime is 30 years when the defendant, like Santana, has a prior felony drug conviction. Santana was sentenced to only 20 years; thus, *Apprendi* is inapplicable.

### 2. *Apprendi* Claims of Other Defendants Except Rosario

All the remaining defendants, except Rosario, were sentenced to prison terms at or below the statutory maximum set in 841(b)(1)(C). For some of these defendants the maximum under § 841 (b)(1)(C) was 20 years and for others, like Wilfredo Hernandez and Sandy Garvin, the maximum was 30 years because they had prior felony drug convictions. All the defendants, however, received sentences below the maximum applicable to them. Since, as discussed above, there was no *Apprendi* violation in this situation even under *de novo* review, we need not further discuss their claims, which we review only for plain error.

### 3. Rosario's *Apprendi* Claim

Rosario was convicted on Count 1 (conspiracy to violate the drug laws), Count 2 (use of minors to distribute narcotics), Count 3 (use of minors to avoid detection of drug law violations), and Count 20 (distribution of narcotics). Based on the court's determination of the quantity of drugs for

which Rosario was responsible, the district court found that the applicable sentencing guideline range was 30 years (360 months) to life. Rosario was given a prison term of 30 years, which was arrived at by imposing 30-year sentences each for Counts 1, 2, and 3, and a 20-year sentence on Count 20—all sentences to run concurrently. As discussed above, since drug quantity was not determined by the jury, the applicable statutory maximum comes from 841(b)(1)(C), which for Rosario provides a maximum of 20 years. Facially this creates an *Apprendi* error, but ultimately we reject Rosario's challenge for the following reasons.

Rosario did not raise his *Apprendi* challenge below so we will overturn his sentence only if we find plain error. We have previously rejected arguments identical to Rosario's. *See*, *e.g.*, *United States v. Martinez*, 289 F.3d 1023, 1027 (7th Cir. 2002); *United States v. Knox*, 287 F.3d 667, 669 (7th Cir. 2002); *United States v. Brough*, 243 F.3d 1078, 1080-81 (7th Cir. 2001); *United States v. Parolin*, 239 F.3d 922, 929-30 (7th Cir. 2001). In each case our reasoning has been the same: while the sentence the defendant received exceeded the statutory maximum for one or more of the counts, it did not extend beyond the sentence that the trial court could have imposed if it had stacked the sentences of all the counts consecutively as it must in certain situations under the sentencing guidelines. *See* U.S.S.G. § 5G1.2(d) (2002) (discussed below). Under such circumstances, when consecutive sentences provide an alternative means of achieving the same sentence without exceeding the maximum for any one count, *Apprendi* is not violated.

Application of this principle to Rosario's case will illustrate the point. As noted above, Rosario was convicted on four separate counts. The judge sentenced him to three 30-year sentences and one 20-year sentence, and

the sentences were to run concurrently. Thus, the sentence fell within the guideline range of 30 years (360 months) to life, the applicable range based on the drug quantity involved as determined by the judge. The sentence of 30 years on some of the counts, however, violates *Apprendi* because the maximum penalty applicable to Rosario under the statute was 20 years. Our review for plain error, however, means we will reverse the sentence only if the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings," *Olano*, 507 U.S. at 736 (citation omitted)—that is, only if the error prejudiced Rosario by imposing on him a sentence greater than he would otherwise have received.[13] *See United States v. Angle*, 254 F.3d 514, 518-19 (4th Cir. 2001) (en banc).

---

[13] The standard of review is at least one of the factors that makes this case distinguishable from language in *Apprendi* that arguably would require us to reach the opposite conclusion. In *Apprendi*, the State of New Jersey argued that Apprendi's 12-year sentence, when there was a 10-year maximum, did not violate the due process clause because the State could have achieved the same result by stacking sentences from other counts. The Supreme Court rejected the argument, however, stating that "[t]he constitutional question . . . is whether the 12-year sentence imposed on count 18 was permissible, given that it was above the 10-year maximum . . . . The sentences on counts 3 and 22 have no . . . relevance to our disposition." *Apprendi*, 530 U.S. at 474. The important distinction to be made with our case, though, is that in *Apprendi* the State of New Jersey was arguing that there was no constitutional error in the sentence; whereas, we have already determined that there was error. In the case now before us, we are simply trying to determine if that error prejudiced Rosario, so as to require reversal under the plain error standard of review. *See United States v. Angle*, 254 F.3d 514, 519 (4th Cir. 2001) (en banc) (distinguishing *Apprendi* on the same basis); *United States v. Page*, 232 F.3d 536, 544-45 (6th Cir. 2000) (same).

Here there is no prejudice because Rosario could have received the same prison term through stacking the sentences in a way that avoided violation of *Apprendi*. In fact, sentencing guideline § 5G1.2(d) provides that where, as here, multiple counts of conviction are involved "the sentence imposed on one or more of the other counts *shall* run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment." U.S.S.G. § 5G1.2(d) (emphasis added).[14] The dis-

---

[14] We noted in *Knox* that "the courts of appeals do not agree whether, in the wake of *Apprendi*, U.S.S.G. § 5G1.2(d) still compels a judge to use consecutive sentences when necessary to construct a term within the Guideline range . . . [but] every court of appeals believes that consecutive sentences are lawful if the district judge chooses to impose them." 287 F.3d at 669 (citations omitted). The language of § 5G1.2(d) is cast in terms of the mandatory rather than the discretionary and the majority of circuits that have decided the issue have found that § 5G1.2(d) is mandatory. *See United States v. Outen*, 286 F.3d 622, 640 n.19 (2d Cir. 2002) ("We have held that the application of § 5G1.2 is largely mandatory."); *United States v. Diaz*, 296 F.3d 680, 684 (8th Cir. 2002) (en banc) ("§ 5G1.2 mandates consecutive sentences in those cases in which the total punishment exceeds the statutory maximum for any one count."); *United States v. Buckland*, 289 F.3d 558, 570 (9th Cir. 2002) (en banc) ("[I]f the Guidelines calculation exceeds the statutory maximum for any count in a case involving multiple counts, then the mandatory provisions of § 5G1.2(d) come into play regarding the question of consecutive sentences."); *United States v. Angle*, 254 F.3d 514, 518 (4th Cir. 2001) (en banc) ("[T]he district court *must* impose consecutive terms of imprisonment to the extent necessary to achieve the total punishment.") (emphasis added); *United States v. Price*, 265 F.3d 1097, 1109 (10th Cir. 2001) ("This court agrees with those circuits which have concluded that § 5G1.2(d) is a mandatory provision."). *But see United States v.*
(continued...)

trict judge in this case found that the specified guideline range applicable to Rosario was 30 years to life. In order to comply with § 5G1.2(d), the district court would have to reach the same 30-year prison term by sentencing Rosario to 20 years on one or more of the counts with a consecutive 10-year sentence on one or more of the other counts. Therefore, we find that the district court's error did not seriously affect the fairness of the proceeding. *See Martinez*, 289 F.3d at 1027. Several other circuits have considered the same argument that Rosario makes today and have held, as we have, that there is no prejudice, and therefore no need to remand, when the application of consecutive sentences under § 5G1.2(d) would result in the same sentence that the defendant already received.[15]

---

[14] (...continued)
*Velasquez*, 304 F.3d 237, 242-43 (3d Cir. 2002) (stating that 18 U.S.C. § 3584 gives district courts discretion to impose consecutive or concurrent sentences); *United States v. Vasquez-Zamora*, 253 F.3d 211, 214 (5th Cir. 2001) (holding that the district court had discretion under 5G1.2(d) to impose a consecutive or concurrent sentence).

[15] *See, e.g.*, *Outen*, 286 F.3d at 640 ("[W]here a defendant is convicted on multiple counts, any error in exceeding the statutory maximum on a single count is harmless if the application of U.S.S.G. § 5G1.2 would require the sentence on one or more of the remaining counts to run consecutively so that defendant's total term of imprisonment remains unchanged."); *Diaz*, 296 F.3d at 684 ("Because § 5G1.2(d) mandates consecutive sentences in those cases in which the total punishment exceeds the statutory maximum for any one count and the district court's calculation of total punishment is not affected by an *Apprendi* error, remand to allow the district court to consider whether to impose consecutive or concurrent sentences would be an idle act."); *Buckland*, 289 F.3d at 572 ("[E]ven if [the defendant] had been
(continued...)

Rosario's *Apprendi* argument is rejected.

## F. Abraham Hernandez's Acceptance of Responsibility

Abraham Hernandez argues that the district court improperly denied his request for a two-level reduction for acceptance of responsibility under § 3E1.1 of the sentencing guidelines. To prevail on this point below, the burden was on Hernandez to "clearly demonstrate" that he was entitled to the reduction by a preponderance of the evidence. *United States v. Muhammad*, 120 F.3d 688, 701 (7th Cir. 1997) (citing U.S.S.G. § 3E1.1(a)). On appeal, we will reverse a district court's refusal to grant an acceptance-of-responsibility reduction only if we find that decision to be clearly erroneous. *Id.* (citations omitted).

---

[15] (...continued)

indicted only under 21 U.S.C. § 841(b)(1)(C), the trial judge, using the Guidelines and § 5G1.2(d), would have been required to sentence him to 324 months made up of consecutive sentences, each of which would not have exceeded 20 years."); *Angle*, 254 F.3d at 518 ("Had the district court been aware when it sentenced [the defendant] that the maximum penalty for his drug trafficking conviction was 20 years, § 5G1.2(d) would have obligated it to . . . order[ ] [the sentences] to be served consecutively."); *Price*, 265 F.3d at 1109 (noting that because 5G1.2 is mandatory, the district court would be forced to impose the same sentence already imposed, so there was no prejudice by the *Apprendi* error); *United States v. Smith*, 240 F.3d 927, 930 (11th Cir. 2001) ("When the ultimate sentence does not exceed the aggregate statutory maximum for multiple convictions, no effect on substantial rights has occurred that must be remedied."); *Page*, 232 F.3d at 545 (holding that there was no prejudice because if § 5G1.2(d) was properly applied then the defendants' "sentences would have been the same as those which were imposed").

The commentary to guideline § 3E1.1 makes clear that the adjustment for acceptance of responsibility "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. § 3E1.1 cmt. n.2. Abraham Hernandez did not plead guilty in this case; rather he forced the government to go to trial to establish his guilt. There is some evidence that he entered into plea negotiations with the government about pleading guilty to Count 1—the conspiracy charge—but nothing came of these negotiations because Abraham Hernandez would not accept the government's conditions on the plea. Thus, they went to trial, where Abraham maintained that he was just "a 20-year-old kid who started hanging around the Lathrop Homes neighborhood, was at the wrong place at the wrong time . . . [and was not] a conspirator." (Tr. 66.) The government was forced to disprove this claim, and it did so.

The commentary to § 3E1.1 also provides that in "rare situations" a defendant may still receive the reduction even though he goes to trial, "for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt." U.S.S.G. § 3E1.1 cmt. n.2. The problem for Abraham Hernandez is that he went to trial to deny that he was part of the conspiracy on a theory of defense that rested solely on the factual claim that he was just a 20-year old kid in the wrong place at the wrong time. He has not provided us with any reason to believe that he went to trial for any other reason than to deny his factual guilt. His appeal from the district court's refusal to grant him a two-point reduction is therefore denied.

### G. Sufficiency of Garvin's Section 851 Notice

Sandy Garvin was convicted on four substantive distribution counts, but he was acquitted of the conspiracy charge. The sentencing judge found that Garvin was responsible for only 0.47 grams of cocaine and thus sentenced him under § 841(b)(1)(C). Based on his prior felony drug conviction Garvin received a sentence of 22 years imprisonment. Garvin claims on appeal that his rights under 21 U.S.C. § 851 were violated because he was not given proper notice that the government would seek an enhancement based on his prior convictions. He did not raise this argument below; thus, we review it under the plain error standard.[16] As stated above, under this standard Garvin must show that there was a plain error that affected his substantial rights. If Garvin can make this showing, then it is within our discretion to reverse if we find that the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Olano*, 507 U.S. at 732 (citations omitted).

Section 851 provides in relevant part:

> No person who stands convicted of an offense under this part [21 U.S.C. § 841, et seq.] shall be sentenced to increased punishment by reason of one or more prior convictions, unless before trial, or before entry of a plea of guilty, the United States Attorney files an information with the court (and serves a copy of

---

[16] Garvin argues that the requirements of § 851 are jurisdictional in nature and thus cannot be waived. Unrecognized by Garvin, however, is that over a month before we heard oral argument in this case we issued our opinion in *United States v. Ceballos*, 302 F.3d 679 (7th Cir. 2002). In *Ceballos*, we held that § 851 is not jurisdictional and expressly overruled our prior cases to the contrary. *Id*. at 692.

such information on the person or counsel for the person) stating in writing the previous convictions to be relied upon.

21 U.S.C. § 851(a)(1). The Government did file a § 851 notice before trial, which informed Garvin that if he were convicted the government would seek to have his sentence enhanced based on two prior drug convictions. The problem with this notice, Garvin asserts, was that it cited 21 U.S.C. § 841(b)(1)(A) as the statute under which an enhanced penalty of life imprisonment would be sought. Whereas, because only 0.47 grams of crack were attributed to Garvin, the trial judge sentenced him under § 841(b)(1)(C), which only provided for an enhanced prior conviction penalty of 30 years. Garvin claims that he was misled by the § 851 notice into thinking that the government would only seek an enhancement if he were held responsible for 50 or more grams of crack cocaine, the requisite amount for § 841(b)(1)(A) to apply.

We begin by noting that the language of § 851(a)(1) does not require that the government set forth which enhanced penalty it will seek in cases where there is more than one available. The statute focuses rather on the disclosure of those prior convictions on which the government intends to rely. The government's § 851 notice here stated precisely which convictions it intended to use for enhancement. Thus, it is not entirely clear that there has been a § 851 violation at all. We however, recognize that some defendants could be misled by citation to a different statute and the subsequent use of a different enhancement. But even assuming there was plain error here, we would not exercise our discretion to reverse because we do not perceive that there was any injustice done to Garvin. The government informed him that because he had two prior convictions, it would seek a penalty of life imprisonment; thus, he was on notice of the severe

consequences he faced if convicted. We do not see any prejudice to Garvin by the government notifying him of a greater enhanced penalty than the one it actually sought. The idea that Garvin was misled into thinking that the government would seek an enhancement to a life sentence if he was convicted for 50 grams of crack, but that it would not seek to enhance to 30 years if he was convicted of a lesser amount is not plausible. Therefore, we find that he has not satisfied his burden under the plain error standard of review.

## H. Determination of Garvin's Status as a Career Offender

Garvin next argues that the district court erroneously classified him as a career offender under U.S.S.G. § 4B1.1. Again, Garvin did not raise this issue below, so our review here is limited to plain error. *United States v. Goudy*, 78 F.3d 309, 315 (7th Cir. 1996).

To receive the classification of "career offender" a defendant must, among other things, have "at least two prior felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 4B1.1. The district court based its determination that Garvin was a career offender on two prior drug convictions: the first, a 1989 state conviction for delivery of cocaine and the second, a 1993 state conviction also for delivery of cocaine. Garvin maintains that the court should not have considered the 1993 conviction because it was part of, or related to, the instant offense.

In *United States v. Garecht*, we held that under § 4B1.2, if a prior conviction was related to the instant offense then that prior conviction could not be used to elevate a defendant to career offender status. 183 F.3d 671, 675 (7th Cir.

1999).[17] To determine whether the prior conviction is related to the instant offense, the guideline commentary directs courts to U.S.S.G. §1B1.3. *See* U.S.S.G § 4A1.2 cmt. n.1 ("Conduct that is part of the instant offense means conduct that is relevant conduct to the instant offense under the provisions of § 1B1.3 (Relevant Conduct)."). "Under U.S.S.G. § 1B1.3, a criminal offense constitutes relevant conduct to another offense if the two offenses are part of a common scheme or plan, connected by at least one common factor (for example, a common victim or purpose)." *Garecht*, 183 F.3d at 674 (citing U.S.S.G. § 1B1.3 cmt. n.9).

Garvin argues that his 1993 conviction is related to the instant case because that conviction involved the sale of drugs in the same geographic area, involved the same Latin Kings gang, and took place less than a year before the conspiracy charged in this case began. Garvin over-looks, however, that he was not convicted of conspiracy here; rather, he was convicted only of four distribution counts that occurred in 1996. Thus, his attempt to estab-lish a close relation based on time frame clearly does not work. More importantly though, the commentary to § 1B1.3 provides an example situation of where courts should find that two offenses are not related that is al-most identical to Garvin's situation:

> *Examples*: (1) The defendant was convicted for the sale
> of cocaine and sentenced to state prison. Immediately,

---

[17] There was dispute between the majority and dissent in *Garecht* over whether § 4B1.2 required that the prior convictions be unrelated to the instant offense (majority position) or whether § 4B1.2 only required that the two prior convictions be unrelated to each other. Because Garvin's argument is rejected under either interpretation we simply accept, without reconsideration, the majority's position in *Garecht* on this issue.

upon release from prison, he again sold cocaine to the same person, using the same accomplices and *modus operandi*. The instant federal offense (the offense of conviction) charges this latter sale. In this example, the offense conduct relevant to the state prison sentence is considered as prior criminal history, not as part of the same course of conduct or common scheme or plan as the offense of conviction.

U.S.S.G. § 1B1.3 cmt. n.8; *see also Garecht*, 183 F.3d at 674-75 (distinguishing the facts in that case from the above cited example and finding that the defendant's situation there was more like the second example given in Application Note 8). As even Garvin admits, this example is nearly indistinguishable from his case. In 1993, he was convicted in state court for the delivery of cocaine and sentenced to imprisonment for the offense. In 1996, he again sold drugs, and this violation led to the instant federal offense—precisely the situation that the guidelines tell us does not qualify as a related offense. Therefore, we find no plain error in the district court's reliance on the 1993 conviction to establish Garvin's status as a career offender.

## I. District Court's Refusal to Grant Garvin a Downward Departure

Garvin finally argues that the district court improperly refused to grant him a downward departure from his sentence. It is clear that we lack jurisdiction to review a sentencing court's refusal to give a downward departure, unless it is established that the sentencing court errantly believed that it lacked the legal authority to grant a downward departure. *United States v. Hegge*, 196 F.3d 772, 774 (7th Cir. 1999) (citations omitted). Thus, the only issues we must decide are whether the district court had the authority to depart and if it did, whether it knew

that it had such authority. As to the first issue, the government does not dispute that the district court had the authority to depart downward from the sentencing range set out in the Guidelines; thus, we accept that if the factual circumstances warranted it, the district court could have departed.[18] As to the second issue, "[w]e presume that the district court knew that it had authority to depart and simply exercised its discretion not to do so. Defendant bears the burden of convincing us otherwise." *United States v. Larkins*, 83 F.3d 162, 168 (7th Cir. 1996).

In attempting to meet this burden, Garvin cites to four instances during the sentencing hearing where the district court appears to express doubt as to whether it could depart. The first two came on June 1st:

> "With respect to your motion for a downward departure, I looked at the cases. It's actually not so clear to me that there is any circumstance in which the Seventh Circuit will approve a motion for a downward departure." (6/1/99 Tr. 12.)

> "I don't want you to be hopeful. I don't think that there is a legal basis for [departing]." (6/1/99 Tr. 21.)

And the second two both came three days later on June 4th:

> "I don't think that I can give [a downward departure]. You know, I mean, I think 262 months is, it is certainly a terribly long sentence." (6/4/99 Tr. 4.)

---

[18] U.S.S.G. § 5K2.0 allows a district court to depart if "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." U.S.S.G. § 5K2.0 (quoting 18 U.S.C. § 3553(b)); *see also United States v. Larkins*, 83 F.3d 162, 168 (7th Cir. 1996).

"I am looking at it, is he out of the heartland of what the guidelines say when I could conceivably give a departure . . . if any are really permitted in this circuit, which I question." (6/4/99 Tr. 6.)

We agree with Garvin that these statements alone are cause for some concern. A closer analysis of the context of the statements and the overall sentencing hearing, however, reveals that the district court did go through the proper steps to determine whether, based on the facts of Garvin's case, she should exercise her discretion to depart.

In *Koon v. United States*, the Supreme Court determined that a sentencing judge considering a motion for downward departure should review the case for factors sufficiently unusual to take the case out of the Guidelines' "heartland." 518 U.S. 81, 92-95 (1996). We have held that under *Koon*, factors that might take a case out of the heartland fall into four categories: (1) forbidden factors (such as race, sex, national origin, creed, religion, socio-economic status, or drug addiction), which can never be considered as a basis for departure, (2) discouraged factors (such as age or education), which can be considered relevant only in "exceptional cases," (3) encouraged factors (such as defendant's role in the offense), which are "explicitly contemplated as grounds for departure," and (4) unmentioned factors. *United States v. Sewell*, 159 F.3d 275, 279 (7th Cir. 1998).

In the case now before us, the district court and the attorneys engaged in a lengthy discussion about whether Garvin's situation fell outside the "heartland" and what factors could be considered in making such a determination. We review this discussion at length because it is only in analyzing it in full that we can determine if the district court knew that it could depart. The first discus-

sion about departure occurred near the beginning of the two day hearing. Here, the judge made the first statement that Garvin cites as support for his claim. This statement does appear to reveal some indecision on the part of the judge about her authority to depart, but Garvin does not cite the immediately following statement where the judge noted that, in deciding whether she should depart, she could not consider the fact that Garvin was a drug addict as a factor in the departure determination—"[t]hat's a forbidden basis." This statement reveals that the judge was apparently aware of our decision in *Sewell* and that, at least, she was going to work under the assumption that she could depart.

The second statement ("I don't think there is a legal basis [to depart]"), when read in context, is simply the judge's reiteration that drug addiction is not a factor which would allow her to depart. That this is what the judge is talking about is seen in Garvin's attorney's response: "Well, Judge, addiction is not (a legal basis) but that was only one element." (6/1/99 Tr. 21.) After this, the defense attorney, the court, and the government discuss the fact that in *Sewell*, we held that a defendant's participation in the offense is an encouraged factor to consider in departing. (*Id.* at Tr. 22-25.) In response to the defendant's argument that Garvin's participation in the conspiracy was minimal (and thus "not within the heartland" (*id.* at Tr. 22)), the district court noted that Garvin was not convicted of conspiracy; therefore, the proper inquiry was his role in the four individual distributions, not his role in the conspiracy. *(Id.* at Tr. 22.) Ultimately, the hearing on June 1 concluded without the judge making a decision on the matter. She stated that she needed more time because originally she had not closely analyzed the cases submitted by the government because after reviewing the defense's cases she "didn't think there was

a sufficient [basis] for a departure." (*Id.* at Tr. 27.) Thus, at the conclusion of the hearing on June 1, it is apparent that the judge believed, or at least assumed, she could depart but did not see a factual basis for doing so.

The June 4 hearing began with the judge stating that after reviewing the evidence and the relevant cases, she had not changed her mind: "I don't find any, having looked at all of that, I don't find any basis for changing the guideline range." (6/4/99 Tr. 2.) After discussion of some other topics, the defense attorney returned to the issue of departure, to which the court responded with the third statement that Garvin cites for support ("I don't think I can give it. You know, I mean, I think 262 months is . . . a terribly long sentence"). This statement, however, when read in context, actually reveals that the judge *did* believe that she *could* depart but that she did not think there was a basis to do so here. Immediately after the statement, the judge reasons that she cannot give a departure because the fact that "he's a drug addict . . . is something I actually can't take into account in terms of departure." (6/4/99 Tr. 4.) Garvin's attorney then raised the argument again that Garvin played a small role in this conspiracy. The judge again responded by noting "[t]hat would be perfectly appropriate if we were talking about putting his role in terms of something as a whole. But all he's being sentenced on are four separate sales. . . ." (*Id.* at Tr. 5.)

Later in the hearing, the judge stated that in making her determination of whether to depart she was considering whether "he [is] out of the heartland of what the guidelines say when I could conceivably give a departure . . . if any are really permitted in this circuit, which I question." (*Id.* at Tr. 6.) This statement does indeed reveal that the judge may not have been entirely clear that she could depart, but it also reveals that she was assuming that she could—why else would she need to go through the

heartland analysis? Ultimately, the judge determined that Garvin's case was not outside the heartland, stating, "I mean, he was walking down the street and selling these drugs with kids running around right in front of him . . . . And so the kids will grow up and do the same thing because . . . that is what people that they look up to are doing. So am I sure it's out of the heartland? No, I don't know that it is. But go on if you have more to say." (*Id*. at Tr. 8.) To this Garvin's attorney responded that "[i]f Your Honor has made up your mind that it's not out of the heartland, I am not going to belabor the point with this Court." (*Id*.) At this point, the judge moved on to another issue. The only logical interpretation then is that the judge had considered the arguments urging her to depart and had determined that Garvin's case was not out of the heartland.

Therefore, even though we are somewhat troubled by the district court's musings on the record that she was not entirely sure she could depart, the fact that she, at the very least, assumed that she could depart and conducted the "heartland" analysis, leads us to the conclusion that a remand is not appropriate here. Further, given that the district court already conducted the heartland analysis, it is not clear what would be gained even if we were to remand—i.e., the district court has already decided that departure is not warranted, and on remand we would simply be telling the court to conduct the same analysis again. Garvin's challenge is therefore rejected.

## J. Rosario's Non-*Apprendi* Claims

### 1. Agent Schulte's Alleged Signals and Gestures at Trial

Rosario claims that during trial FBI Agent Schulte was signaling and gesturing to witnesses on the stand. He

argues that because the jurors may have seen this and may have been influenced by it, he should be given a new trial. Although some of the defense attorneys briefly discussed the issue with the court at trial, no formal objection was ever made, and neither Rosario nor his attorney raised the issue before this appeal. Therefore, again, our review is only for plain error, and we note that Rosario's burden is particularly high here because "[t]he district court will always be in a better position than the appellate judges to assess the probable reactions of jurors in a case over which he [or she] has presided." *United States v. Berry*, 92 F.3d 597, 600 (7th Cir. 1996) (quoting *United States v. Bruscino*, 687 F.2d 938, 941 (7th Cir. 1982) (en banc)).

Rosario provides no evidence of any wrongdoing nor any evidence of prejudice. In fact, the defense attorneys that did raise the issue at trial all stated that they did not think there was any wrongdoing. For example, Diaz's attorney told the court, "I did observe Agent Schulte nodding. I don't say that it was conscious . . . I don't think it was conscious, of course." (Tr. 1266-67.) And Stevenson's attorney stated, "I have been watching Mr. Schulte and I do not doubt . . . that what he's saying is the truth, and I don't believe that any of this is being telegraphed. But I must say this: as a result of watching Mr. Schulte, he's . . . expressive . . . . And I'm not suggesting that they're— he's telegraphing it at all. I think it's just his personal mannerisms. " (Tr. 1267-68.) Nothing more was ever made of this issue. Given that even the defense attorneys suggested that there was no real issue here, we think that the district court properly handled the matter. Rosario's claim is rejected.

### 2. District Court's Enhancement of Rosario's Sentence

At sentencing, the district court applied a four-point enhancement under U.S.S.G § 3B1.1(a) for Rosario's role as a leader of the conspiracy and a two-point enhancement under U.S.S.G. § 2D1.1(b)(1) for the possession of firearms during the commission of the offense. Rosario argues that these enhancements were improper. A sentencing court's factual determination concerning a defendant's role as a leader is subject to a clearly erroneous standard, *United States v. Hardamon*, 188 F.3d 843, 851 (7th Cir. 1999), as is its factual determination that the defendant possessed a firearm. *United States v. Chandler*, 12 F.3d 1427, 1435 (7th Cir. 1994). Because the evidence overwhelmingly supported the application of both enhancements, we find no clear error.

Section 3B1.1(a) instructs a sentencing court as follows: "If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels." U.S.S.G. § 3B1.1(a). The record shows that in 1995 Rosario was elected to the position of "Inca" (the leader of the gang) by his fellow gang members. Audio tapes of gang meetings reveal Rosario inquiring about who was doing security on Nation Days and directing enforcers to do their job. Further, the government presented evidence that Rosario determined when Nation Days would take place and how often, and that he presided over the meetings at which the leaders of the gang discussed their drug business. Rosario's primary argument is that it was Juan Hernandez, the gang's treasurer, who really directed the activities on Nation Days. Rosario neglects to mention that he was the one who personally appointed Juan Hernandez to serve in this role. More importantly, while the evidence

does show that Juan Hernandez did play a central role, Rosario does not dispute that an organization can have more than one leader. *See* U.S.S.G. § 3B1.1 cmt. n.4. And the evidence here shows that the district court did not commit clear error in finding that Rosario was a leader of this conspiracy.

Likewise, we affirm the district court's enhancement for possession of a dangerous weapon. Under § 2D1.1(b)(1), a defendant "possesses" firearms if he actually or constructively possessed the gun. *United States v. Brack*, 188 F.3d 748, 763-64 (7th Cir. 1999). Moreover, "a defendant can be held responsible for a co-defendant's possession of a weapon if that possession was in furtherance of . . . jointly undertaken criminal activity and was reasonably foreseeable by the defendant." *Id.* at 764 (quoting *United States v. Taylor*, 111 F.3d 56, 59 (7th Cir. 1997)). The audio tapes presented by the government provide various examples of Rosario inquiring about the gang's guns. Further, there was much evidence that the gang stored guns at members' houses and that co-conspirators used guns for security on Nation Days. Thus, there was no clear error in the district court's determination that Rosario possessed firearms.

Rosario's final argument that the government failed to prove that the substance involved was crack cocaine as opposed to some other type of cocaine base also fails because the government did introduce sufficient evidence to establish that crack cocaine was the substance that Rosario and the other gang members distributed. Therefore, Rosario's sentence is affirmed.

### III. Conclusion

For the foregoing reasons the convictions and sentences of all eight defendants are AFFIRMED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of
Appeals for the Seventh Circuit*