NOTICE

Decision filed 03/06/23. The text of this decision may be changed or corrected prior to the filing of a Peti ion for Rehearing or the disposition of the same.

2023 IL App (5th) 190372-U

NO. 5-19-0372

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 17-CF-2618 |
| | ) | |
| STEVEN McGAULEY, | ) | Honorable |
| | ) | Richard L. Tognarelli, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Justices Welch and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm the defendant's convictions and sentences for first degree murder and domestic battery because the charges were properly joined, there was no plain error regarding jury instructions, the defendant received effective assistance of counsel, and the trial court did not err in denying the motion for mistrial.

¶ 2    The defendant, Steven McGauley, appeals his convictions and sentences, following a trial by jury in the circuit court of Madison County, for one count of first degree murder and one count of domestic battery. For the following reasons, we affirm the defendant's convictions and sentences.

¶ 3                                          I. BACKGROUND

¶ 4    We have thoroughly reviewed the record on appeal; however, for purposes of brevity and judicial economy, we discuss only the facts necessary to our disposition of this appeal. On

1

September 5, 2017, the defendant was charged, by information, with two counts of first degree murder and one count of domestic battery. Thereafter, the defendant was indicted by a grand jury for the same offenses on September 28, 2017.

¶ 5     On August 10, 2018, the State filed a notice of its intent to introduce evidence of prior domestic violence incidents pursuant to section 115-7.4(a) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.4(a) (West 2018)). In response, on December 17, 2018, the defendant filed a motion to sever which sought separate trials for the offenses of first degree murder and domestic battery. The State filed its response to the motion to sever on December 31, 2018.

¶ 6     A pretrial hearing was conducted on January 31, 2019. The trial court heard arguments on various motions, including the State's notice of intent to introduce evidence of prior domestic violence incidents and the defendant's motion to sever.

¶ 7     With regard to the notice of intent to introduce evidence of prior domestic violence, the State argued that the specific incidents sought to be introduced occurred on April 7, 2017, and May 13, 2017, and both involved the defendant and Mary McGauley (Mary). Regarding the April 7, 2017, incident, law enforcement officers were called to the defendant's home, and Mary reported to them the defendant pushed her into a closet causing her to hit her left shoulder. Mary sought treatment for her left shoulder the same day. Regarding the May 13, 2017, incident, officers were again called to the defendant's home after Mary called 911 and reported that she had been struck in the face by the defendant. The State argued that its burden under section 115-7.4(a) of the Code was met because both incidents fell within the realm of domestic violence, they were close in proximity, within five months, to the domestic battery incident at issue, and they involved the same individuals.

¶ 8     Defense counsel argued that the domestic battery that allegedly occurred on September 3, 2017, was separate and distinct from the alleged first degree murder on the same day. Further, defense counsel argued that the probative value of the evidence of prior incidents of domestic violence would be unduly prejudicial. Defense counsel stated, "It is clear the State is attempting to prove to the jury or any other trier of fact that you must find the defendant guilty of first degree murder based upon the fact that he is a bad man."

¶ 9     With regard to the motion to sever, defense counsel argued, *inter alia*, that if evidence regarding prior uncharged allegations of domestic violence was allowed, the domestic violence charge should be severed from the first degree murder charge. Defense counsel argued that if it appears the defendant would be prejudiced by the joinder of separate charges, the trial court may grant a severance and order separate trials. In this matter, defense counsel alleged that the charges bore no relationship to one another and would result in extreme prejudice to the defendant. Further, he alleged that the first degree murder charges involve the defendant and Steven Flack (Steven), whereas the domestic battery charge involves the defendant and Mary. He also alleged that the alleged offenses were separated by hours and were claimed to have occurred in different areas of the defendant's property. Defense counsel contended that to try these separate offenses together would confuse the jury.

¶ 10    Counsel for the State agreed that the elements the trial court was to consider when deciding whether the charges and trials should be severed were the proximity in time, the location, and the identity of the evidence that would be submitted to prove each charge. The State argued that the evidence would show that the proximity in time between the alleged incidents was less than 30 minutes, that they occurred at the same exact location—the defendant's property, and that it would not be possible to present evidence on the alleged murder alone because the alleged domestic

3

battery incident would have to be presented to the jury to explain what occurred. The State contended that to sever the charges and try them separately would confuse the jury.

¶ 11    Following arguments of counsel, by oral pronouncement, the trial court denied the motion to sever. The trial court stated as follows:

> "I don't see how we can separate these cases. I think the evidence is gonna [*sic*] have to come in one way or the other. I mean, you know, it is the same location. It is the same time. It's the same investigation. Two different offenses, but occurring at the same time. Again, I think it would be more confusing to the jury if we did sever these cases. And I do think the jurors are more sophisticated and [will] be able to separate those charges out and determine your client's guilt or innocence on all those charges."

¶ 12    The defendant's jury trial began on February 11, 2019. *Voir dire* took place over two days on February 11, 2019, and February 12, 2019. Opening statements were presented on February 12, 2019. Also on February 12, 2019, the State called the following witnesses to testify: Andrew Buettner, a 911 dispatcher; Zachary Napoli, a Glen Carbon Fire District paramedic; and Leah Flack, the victim's wife. On the third day of trial, February 13, 2019, the State called Dr. Kamal Sabharwal, a forensic pathologist; Thomas Gamboe Jr., a forensic scientist who specialized in firearms; and John Paul Kibbons.

¶ 13    Of relevance to this appeal is the testimony of John Paul Kibbons. Kibbons was called as a witness by the State and began his testimony on the afternoon of February 13, 2019. Kibbons testified, *inter alia*, that he was disabled as a result of an accident. He testified that he had known Mary and Steven since they were children.

¶ 14    Kibbons testified that he recalled Labor Day weekend of 2017, and that he was spending that weekend at the defendant's house. He testified that when he first got to the defendant's house

4

that weekend that everyone was getting along, and they had been drinking beers, whiskey, and just partying.

¶ 15    Next, Kibbons testified regarding the events of September 3, 2017. He stated it was a Sunday and he woke up around 4 a.m. He had been sleeping in a bedroom located in the basement of the defendant's house. Upon waking, Kibbons walked outside and began drinking beers and whiskey at 4 a.m. He was alone outside on the deck, which was attached to the garage and separated from the defendant's house by a walkway, for a few hours.

¶ 16    Kibbons testified that the defendant was the next person to wake up that morning at approximately 7 a.m. The defendant joined Kibbons on the deck and he began drinking beers and whiskey. Steven was the next person to wake up. By the time Steven awoke, there was no more beer or whiskey at the defendant's house. Kibbons and Steven left the defendant's house and drove to a gas station where they bought beers, whiskey, and two big sandwiches. Upon returning to the defendant's home, Steven and Kibbons returned to the deck and joined the defendant and Mary. Leah was also at the house, but she was inside working.

¶ 17    Kibbons testified that at approximately 4 p.m., the defendant, Mary, and Steven left the house, but Kibbons did not know where they went. He stated that he went downstairs to go to bed and he fell asleep. Later, he was awoken by Steven after his return to the defendant's house.

¶ 18    Kibbons testified that Steven headed upstairs a little bit ahead of him, but that he followed closely after. He testified that as he headed up the stairs that he heard a "real hard thud." Kibbons was then given permission by the trial judge to demonstrate how, upon reaching the top of the stairs, he saw Mary on the floor with the defendant's hand in her hair. Kibbons then testified that Steven told him, "he put his hands on her." After this statement was made, the defendant and Mary physically separated, and Kibbons considered the situation defused.

5

¶ 19　Kibbons testified that he and Steven proceeded outside to sit at the patio table. Kibbons stated that the defendant then proceeded to exit his house through the back door. Kibbons described the defendant at this time as having a "horrible demeanor. It was frightening, threatening." Kibbons testified that the defendant stated, "Come on, come on, both of ya, let's do this, come on out here." Kibbons testified that he took the defendant's statements to mean that he was inviting Steven and Kibbons out into the yard to fight him. While this was transpiring, Mary was standing on the deck.

¶ 20　Kibbons testified that Steven joined the defendant in the yard and that the defendant was continuing to say, "Let's go, let's fight, both of ya." Kibbons stated that the defendant was approaching Steven in a threatening manner, and Steven defended himself by attempting to punch the defendant, but he did not land a punch. Steven was able to push the defendant into a post on a privacy fence. The fight then ended and Steven proceeded back to the deck.

¶ 21　Kibbons testified that the defendant then walked back to the deck and said to Mary, "Did I do what you thought I was going to do?" Kibbons stated the defendant seemed angry and he said this to Mary more than once. Kibbons observed that the defendant's "eye was fat," but he was not bleeding. Then, the defendant went into his house.

¶ 22　After the defendant went inside, there was a short period of time where Kibbons was the only person remaining on the deck. He testified that Steven had started gathering his belongings to leave and returned to tell Kibbons bye. As Kibbons and Steven were on the deck, the defendant came back outside. Kibbons described him as looking like "a monster." He testified that the defendant proceeded down the stairs and then Kibbons saw the defendant had a gun. Kibbons testified that before he could say anything that the defendant raised the gun and shot Steven. Kibbons recalled four gunshots. Kibbons testified that neither the defendant nor Steven had said anything to one another.

¶ 23    After Steven was shot, Kibbons testified that he pulled a knife on the defendant to threaten him. He then stated that the defendant emptied the shells from the revolver, showing he was no longer a threat, so Kibbons put away his knife.

¶ 24    Next, Kibbons called 911. The police arrived and Kibbons stated he cooperated with the officers. Kibbons testified that approximately five minutes elapsed between the incident inside the house between the defendant with Mary on the floor with his hand in her hair and the defendant shooting Steven. Kibbons testified that he had been drinking that day. He stated after awaking from his three-hour nap he had one shot of whiskey prior to Steven being shot.

¶ 25    On cross-examination, Kibbons agreed that his testimony at trial was the fourth time, of record, that he had recounted the events of September 3, 2017. He gave a statement at the scene, a statement shortly thereafter at the police station, a statement a few days later, and his statement at trial. Kibbons acknowledged that he initially told officers that he thought everyone was joking inside the house and he did not see any violence inside the house.

¶ 26    Kibbons further stated on cross-examination that when he approached the defendant and Mary inside the house, the defendant "looked at me with the meanest, most monstrous face and said 'if a woman—if a woman puts herself in a man's place, a man can take that woman down.' " He agreed that on his direct examination he had testified that the defendant had not said anything at the time.

¶ 27    Kibbons was then allowed to refresh his recollection by watching and listening to the videotaped interview he gave at the police station on September 3, 2017. After viewing the interview, Kibbons agreed that he told police that he thought the incident between the defendant and Mary was a joke. He also stated that Steven was calm, and that Kibbons did not report Steven saying anything to him inside the house.

7

¶ 28    Kibbons testified that he and Steven were alone outside for approximately five minutes. During this time, Kibbons took a shot of whiskey directly from the bottle. Kibbons testified that was how he had been drinking the whiskey on September 3, 2017.

¶ 29    While being questioned about how much alcohol he had consumed that day, Kibbons stated, "Sorry, my recollection is hard. I mean I got about—my memory is really bad. Real bad. I have brain damage, and so it's hard for me to recall lots of things." He stated he was in a car accident in 2002, which caused him to "die twice," so there was a lack of oxygen to his brain, which resulted in the damage.

¶ 30    Cross-examination regarding Kibbons' memory problems and inconsistencies in his statements continued. He was shown various portions of his prior videotaped interview. During one of the times he was being shown a DVD, Kibbons suffered a seizure and the courtroom was cleared.

¶ 31    Following Kibbons' medical incident, the trial court and counsel had the following discussion:

"THE COURT: Let's go back on the record. We're outside the presence of the jury. During cross-examination of John Paul Kibbons, Mr. Kibbons suffered a seizure. The courtroom and the jurors were discharged at that point.

Folks, my thought at this point is that we end for today. We come back tomorrow. Maybe Mr. Kibbons will be able to rejoin us.

MR. SCROGGINS [(Defense Counsel)]: If he is not, what happens?

THE COURT: Well, I'll let you make your record. I do think you have had sufficient time for cross-examination, but you can make your record whatever you want. But I would hope that he'll be able to come back. He seemed okay when he left here. I'm not a doctor, but hopefully he'll be back.

8

MR. SCROGGINS: Did he walk away?

THE COURT: He was on the stretcher, but he got on the stretcher.

MR. SCROGGINS: Oh, okay.

THE COURT: So at least for today I'm going to discharge the jurors, have them come back in the morning. Any objection to that, Miss Davis [(Assistant State's Attorney)] or Miss Hudson [(Assistant State's Attorney)]?

MS. HUDSON: No, Your Honor.

MR. SCROGGINS: No objection to that.

THE COURT: All right. And then we'll take up the other issue about completing your cross-examination."

¶ 32 On the fourth day of trial, February 14, 2019, the defendant moved for a mistrial due to Mr. Kibbons' seizure while testifying. The written motion contained, *inter alia*, the following allegations:

"2. Defendant's attorney had just begun his cross examination when the witness collapsed during testimony, falling from his chair and striking his head on the desk and concrete floor.

3. The State's witness proceeded to suffer from a violent seizure as he gasped for air, twitched, gurgled, and spasmed for approximately the next twenty minutes.

4. The jury witnessed the violent collapse of the witness.

5. After several minutes of emergency medical care, the judge cleared the courtroom.

6. Jurors, witnesses, and bystanders milled around together in the courtrooms or the chamber."

9

¶ 33    When defense counsel presented oral argument to the trial court on the motion for a mistrial, he acknowledged the seizure may have lasted less than 20 minutes. They presented three reasons to support the defendant's motion for a mistrial. First, counsel stated it was a concern that the jurors might have discussed the event with their family or amongst themselves or have looked to outside sources of information to discover what had taken place. Second, they stated it was a concern that sympathy for Kibbons might bolster his testimony. The final concern was that Kibbons was not subjected to a complete cross-examination.

¶ 34    The State asserted that it believed that Kibbons would be able to return to complete his cross-examination. The State also noted that Kibbons' direct examination had lasted approximately 45 minutes, while the seizure occurred approximately an hour or more into the cross-examination of Kibbons. The Stated contended that

> "what actually happened with the jury is the witness had a seizure and it was seconds after the seizure started that the bailiff very effectively got [the jury] out of the courtroom. So what they saw about that was a snapshot, it wasn't the emergency personnel coming in, it wasn't him being put on a stretcher. They were not privy to any of that."

The State, *inter alia*, argued that the movant for a mistrial must show actual prejudice, and in this matter the defendant only offered speculation as to what the jury might have been thinking or how it affected them. Following the conclusion of the State's argument, defense counsel stated, "Can I disagree—" And the trial court responded as follows:

> "No. We've spent too much time already; all right? You've made your record on this issue. I would agree that the cross examination here was longer than the direct, at least I have more notes. You took almost a half an hour with the witness looking at things on the computer. I think the cross examination was very effective. What happened here was a medical episode, and in less than two minutes the jury was taken out of this courtroom. I

10

don't think they were affected by this at all. And we let them go, excused them for the day. Your motion for mistrial and your record is noted, but the motion for mistrial, at least at this point in time, is denied."

¶ 35   The State proceeded with its next witness, Mary. Mary initially invoked her fifth amendment right not to testify or to incriminate herself. After she was granted immunity, the State proceeded and Mary was eventually declared a hostile witness. We will limit our recitation of Mary's testimony to those issues before us on appeal.

¶ 36   Outside the presence of the jury, when defense counsel anticipated the State would begin questioning Mary about prior domestic issues, he requested that the jury be instructed that the evidence of prior domestic issues is only to be considered as to the charge of domestic battery and not the charge of first degree murder. The State objected to the proposed language as it was not an Illinois pattern instruction and had not been used in any prior cases. The trial court stated, "I will admonish the jury with your statement over objection of the People. You need to let me know before we get into that specific area. Write down specifically, Mr. Scroggins, what you would like me to admonish, make sure Ms. Davis gets to review that." Mary's testimony resumed.

¶ 37   After the State indicated to the trial court it would be inquiring as to the prior abuse, the following admonishment was given to the jury:

"THE COURT: All right. Ladies and Gentlemen, the evidence that you are going to hear at this point is only to be considered by you as to the domestic battery charge."

The State proceeded to inquire about the prior incidents of domestic violence between the defendant and Mary.

¶ 38   Following cross-examination of Mary, the State called its next witness, Sergeant Christopher Brindley of the Madison County Sheriff's Office. Following Sergeant Brindley's testimony, the trial was adjourned for the day.

11

¶ 39    On February 15, 2019, the State called Captain Mike Dixon of the Madison County Sheriff's Office; Michael Coles, a sergeant with the Madison County Sheriff's Office; Jamie Souder, a neighbor who was walking her dog near the defendant's house at the time of the incident; Patrick Barnes, a patrolman with the Glen Carbon Police Department; and Sharon Heuiser, a paramedic with the Glen Carbon Fire District.

¶ 40    The trial resumed on February 19, 2019, following a court holiday on February 18, 2019. Kibbons was recalled to continue his cross-examination. Defense counsel first inquired about Kibbons' current medical condition. Kibbons indicated he was fully up to testifying, and defense counsel continued to cross-examine him. He again was presented with a recorded interview that only he could see and hear and was questioned regarding the inconsistent statements he made in the interview compared to his earlier trial testimony. Following the completion of Kibbons' testimony, the State called Detective Cade Koelker of the Madison County Sheriff's Office; Lieutenant Kristopher Tharp of the Madison County Sheriff's Office; and Detective Timothy Lawrence of the Madison County Sheriff's Office. The State then rested its case.

¶ 41    Following the close of the State's case, the defendant moved for a directed verdict on each count. The trial court denied the motion for each count. The defense began presenting its evidence and called Officer Norton Miller of the Glen Carbon Police Department to testify. Following his testimony, the trial was adjourned for the day.

¶ 42    The following day, February 20, 2019, the defense continued its case and called the following witnesses: Officer Nicholas Bardelmeier of the Madison County Sheriff's Office; Nurse Valerie Bassett of the Madison County Sheriff's Office; the defendant; and defendant's expert witness, Sergeant Allen O'Guin. The defense then rested its case, and the trial was adjourned for the day.

¶ 43 The following morning, a jury instruction conference was conducted outside the presence of the jury. The earlier tailored instruction, "the evidence that you are going to hear at this point is only to be considered by you as to the domestic battery charge," that was given immediately prior to Mary's testimony was not requested to be given as part of the final jury instructions.

¶ 44 Then, closing arguments were given. The jury was read the jury instructions and they were discharged for deliberations.

¶ 45 At approximately 12:54 p.m., the clerk received a note from the jury that stated:

"Is the charge of domestic [b]attery only relatable to the [i]ncident on Sunday Sept[ember] 3rd, or are we combining previous incidents eluded [*sic*] to as part of the charge, or were the previous incidents just used [*sic*] as an example of previous behavior and not part of the current domestic [b]attery charge."

By agreement, the following portion was circled, "or were the previous incidents just jused [*sic*] as an example of previous behavior and not part of the current domestic [b]attery charge," and the note was returned to the jury with a clean copy of Illinois Pattern Jury Instructions, Criminal (IPIC), 3.14, modified, which stated:

"Evidence has been received that the Defendant has been involved in an offense other than those charged in the indictment. This evidence has been received on the issue of the Defendant's propensity and may be considered by you only for that limited purpose. It is for you to determine what weight should be given to this evidence on the issue of propensity."

Later that day, at approximately 3:15 p.m., the jury returned its verdict. The jury found the defendant guilty as to count I, the offense of first degree murder, and as to count III, the offense of domestic battery. Additional facts will be presented as necessary to analyze the claimed errors.

13

¶ 46                                     II. ANALYSIS

¶ 47                              A. Severance of Charges

¶ 48    On appeal, the defendant contends, *inter alia*, that he was denied a fair trial because the trial court denied his motion to sever and his trial proceeded on both the charge of first degree murder and the misdemeanor domestic battery charge. The defendant asserts that joinder of the charges was improper because the charges were not part of the same comprehensive transaction. Additionally, the defendant maintains that joinder resulted in substantial prejudice.

¶ 49    Section 111-4(a) of the Code provides that "[t]wo or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are based on the same act or on 2 or more acts which are part of the same comprehensive transaction." 725 ILCS 5/111-4(a) (West 2018). Further, "[t]he court may order 2 or more charges to be tried together if the offenses and the defendants could have been joined in a single charge. The procedure shall be the same as if the prosecution were under a single charge." *Id.* § 114-7. However, if it appears that a defendant is prejudiced by the joinder of separate charges, the trial court "may order separate trials." *Id.* § 114-8(a).

¶ 50    "The consolidation of separately charged offenses for a single jury trial rests within the sound discretion of the trial court [citation], as does the decision whether to sever charges for trial." *People v. White*, 129 Ill. App. 3d 308, 315 (1984). The decision to grant or deny a motion to sever will not be reversed unless the trial court abused that discretion. *People v. Paik*, 257 Ill. App. 3d 620, 685 (1993). "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Caffey*, 205 Ill. 2d 52, 89 (2001).

¶ 51    The analysis of whether two offenses are part of the same comprehensive transaction is a preliminary requirement for statutory joinder. *People v. Walston*, 386 Ill. App. 3d 598, 603 (2008).

14

When making this determination, the trial court considers the following factors: "[(1)] the proximity in time and location of the offenses, [(2)] the identity of evidence needed to demonstrate a link between the offenses, [(3)] whether there was a common method in the offenses, and [(4)] whether the same or similar evidence would establish the elements of the offenses." *People v. Gapski*, 283 Ill. App. 3d 937, 942 (1996). The first and second factors are the most important when determining whether the offenses were part of the same comprehensive transaction. *People v. Quiroz*, 257 Ill. App. 3d 576, 586 (1993). "There is no requirement that the victims be the same, provided the other criteria for joinder have been satisfied." *People v. Harmon*, 194 Ill. App. 3d 135, 141 (1990).

¶ 52　　Once a determination has been made that the charged offenses were part of the same comprehensive transaction, then an assessment of potential prejudice can be made. *Walston*, 386 Ill. App. 3d at 603. "A defendant's pretrial motion for severance must demonstrate specifically the prejudice complained of; mere apprehensions of prejudice are insufficient." *Paik*, 257 Ill. App. 3d at 632. When "ruling on a motion for severance, the trial judge must make a prediction about the likelihood of prejudice at trial, taking into account the papers presented, the arguments of counsel, and any other knowledge of the case developed from the proceedings." *Id.*

¶ 53　　The defendant filed his motion to sever on December 17, 2018. The motion, *inter alia*, alleged:

> "4. As it is apparently the State's intention to convince a jury that Defendant is guilty of First Degree Murder by prejudicing them with past allegations of domestic strife, Defendant moves this Court to sever the two charges of First Degree Murder (Class M) and Domestic Battery (a Class A Misdemeanor) pursuant to 725 ILCS 5/114-8.
>
> ***

15

6. The Defendant asserts that the charges bear no relationship to one another and would result in prejudice to the Defendant.

* * *

14. In conclusion, the Defendant is on trial for First Degree Murder and faces a possible sentence which would undoubtably guarantee the rest of his life would be served in an Illinois prison. His right to a fair trial should not be infringed upon by allowing the State to try these offenses together, subsequently introducing evidence that would otherwise be inadmissible in a trial of this magnitude."

¶ 54 The defendant's motion to sever mentions his apprehensions about prejudice, but did not specially allege how he would be prejudiced. At the pretrial hearing, the trial court first heard arguments on the State's notice of intent to introduce evidence of prior domestic violence. The State withdrew some prior incidents mentioned in its original notice and instead sought that the specific incidents to be introduced occurred on April 7, 2017, and May 13, 2017, and both involved the defendant and Mary. As explained above, regarding the April 7, 2017 incident, law enforcement officers were called to the defendant's home, and Mary reported to them the defendant pushed her into a closet causing her to hit her left shoulder. Mary sought treatment for her left shoulder the same day. Regarding the May 13, 2017, incident, officers were again called to the defendant's home after Mary called 911 and reported that she had been struck in the face by the defendant. The State argued that its burden under section 115-7.4(a) of the Code was met because both incidents fell within the realm of domestic violence, they were close in proximity, within five months, to the domestic battery incident at issue, and they involved the same individuals.

¶ 55 Defense counsel argued that the domestic battery that allegedly occurred on September 3, 2017, was separate and distinct from the alleged first degree murder on the same day. Further,

16

defense counsel argued that the probative value of the evidence of prior incidents of domestic violence would be unduly prejudicial. Defense counsel stated, "It is clear the State is attempting to prove to the jury or any other trier of fact that you must find the defendant guilty of first degree murder based upon the fact that he is a bad man."

¶ 56 Next, the trial court heard arguments on the motion to sever, which were related to and included some of the earlier arguments regarding the notice of intent. Defense counsel continued to argue that the defendant would be prejudiced because the jury would think he was a "bad man." The State argued that in addition to the proximity of time and location, the offenses were part of one continuing narrative. The State argued that even assuming *arguendo* that the trials were severed, the jury hearing the evidence regarding the offense of first degree murder would hear the evidence regarding the incident inside the home when Mary was on the floor with the defendant above her.

¶ 57 After considering the aforementioned legal principles as applied to the instant case, we cannot say that the trial court abused its discretion when it determined that the two separate charged offenses were part of the same comprehensive transaction and that the defendant would not be prejudiced by a single jury hearing both offenses. When the trial court denied the motion to sever, it stated:

> "I don't see how we can separate these cases. I think the evidence is gonna [*sic*] have to come in one way or the other. I mean, you know, it is the same location. It is the same time. It's the same investigation. Two different offenses, but occurring at the same time. Again, I think it would be more confusing to the jury if we did sever these cases. And I do think the jurors are more sophisticated and [will] be able to separate those charges out and determine your client's guilt or innocence on all those charges."

17

The trial court determined the first and second factors weighed in favor of joinder. Additionally, the trial court stated the jury would be able to separate the offenses and determine the defendant's guilt or innocence on those charges. We reiterate that "[a]n abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *Caffey*, 205 Ill. 2d at 89. Here, there is no evidence that the ruling was arbitrary, fanciful or unreasonable; to the contrary, it was based on a thorough analysis of the issues before the court. Moreover, we believe a reasonable person could take the view adopted by the trial court, for the reasons stated by the trial court. Accordingly, we conclude there was no error.

¶ 58                                B. Jury Instructions

¶ 59    The defendant next contends that the verdict was unreliable because at the close of evidence, the jury was not given a tailored limiting instruction that the propensity evidence was only to be used regarding the misdemeanor domestic battery charge and not the first degree murder charge. On appeal, the defendant asserts that it was plain error to give IPIC 3.14, modified, which stated:

"Evidence has been received that the Defendant has been involved in an offense other than those charged in the indictment. This evidence has been received on the issue of the Defendant's propensity and may be considered by you only for that limited purpose. It is for you to determine what weight should be given to this evidence on the issue of propensity."

Earlier in the trial, at defendant's request, the trial judge gave the following limiting instruction to the jury immediately before questioning began regarding prior incidents of domestic battery:

"THE COURT: All right. Ladies and Gentlemen, the evidence that you are going to hear at this point is only to be considered by you as to the domestic battery charge."

At trial, the defendant did not offer an alternative IPIC 3.14 modified instruction nor object to the instruction that was given at the close of evidence.

¶ 60     "Generally, a defendant forfeits review of any putative jury instruction error if the defendant does not object to the instruction or offer an alternative instruction at trial and does not raise the instruction in a posttrial motion." *People v. Herron*, 215 Ill. 2d 167, 175 (2005). However, Illinois Supreme Court Rule 451(c) provides that "substantial defects [in jury instructions in criminal cases] are not waived by failure to make timely objections thereto if the interests of justice require." Ill. S. Ct. R. 451(c) (eff. Apr. 8, 2013). "Rule 451(c)'s exception to the waiver rule for substantial defects applies when there is a grave error or when the case is so factually close that fundamental fairness requires that the jury be properly instructed." *People v. Hopp*, 209 Ill. 2d 1, 7 (2004).

¶ 61     Jury instructions are used to give the jurors the applicable law so they can apply it to the facts and reach a correct conclusion. *Id.* "Thus, the erroneous omission of a jury instruction rises to the level of plain error only when the omission creates a serious risk that the jurors incorrectly convicted the defendant because they did not understand the applicable law, so as to severely threaten the fairness of the trial." *Id.* at 8. "Jury instructions should not be misleading or confusing [citation], but their correctness depends upon not whether defense counsel can imagine a problematic meaning, but whether ordinary persons acting as jurors would fail to understand them." *Herron*, 215 Ill. 2d at 187-88. "The task of a reviewing court is to determine whether the instructions, considered together, fully and fairly announce the law applicable to the theories of the State and the defense." *People v. Mohr*, 228 Ill. 2d 53, 65 (2008). "Jury instructions should be construed as a whole, rather than read in isolation." *People v. Parker*, 223 Ill. 2d 494, 501 (2006).

¶ 62     In this case, the jury did not receive a complete version of IPIC 3.14 that included the earlier tailored limiting instruction. However, like the court in *People v. Clark*, 2015 IL App (1st)

131678, ¶ 80, after considering the complete instructions given to this jury, we find that the error in giving an incomplete instruction did not create a serious risk that the jury misapplied the law and thus did not rise to the level of plain error. The jury was told that "[e]vidence has been received that the Defendant has been involved in an offense other than those charged in the indictment. This evidence has been received on the issue of the Defendant's propensity and *may be considered* by you only for that limited purpose. It is for you to determine what weight should be given to this evidence on the issue of propensity." (Emphasis added.) Additionally, as part of IPIC 1.01, the jury was instructed that "[a]ny evidence that was received for a limited purpose should not be considered by you for any other purpose." Further, the jury was given a tailored limited instruction immediately prior to the evidence being presented regarding prior domestic violence incidents.

¶ 63     Additionally, in this case, the note sent by the jury demonstrates that it did understand that the evidence regarding prior incidents of domestic violence was not for the first degree murder charge but for domestic battery. The note sent by the jury only inquired about domestic battery and did not mention the first degree murder charge.

¶ 64                                    C. Ineffective Assistance

¶ 65     As an alternative theory, the defendant contends that if the jury instruction error was not plain error, we should find that the defendant's trial counsel was ineffective for failing to correct the instructional error. We disagree and find that the defendant has not shown that his right to a fair trial was prejudiced.

¶ 66     Allegations of ineffective assistance of counsel are reviewed pursuant to the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Cathey*, 2012 IL 111746, ¶ 23. For a claim of ineffective assistance of counsel, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine

20

confidence in the outcome." *Strickland*, 466 U.S. at 694. To prevail on an ineffective-assistance-of-counsel claim, a defendant must demonstrate both that counsel's performance fell below an objective standard of reasonableness and that counsel's deficient performance resulted in prejudice. *Id.* at 687-88.

¶ 67 "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). The defendant's failure to satisfy either the deficiency prong or the prejudice prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *Strickland*, 466 U.S. at 697. Accordingly, it is not necessary to first evaluate whether counsel's performance was deficient if a defendant is unable to show sufficient prejudice. *Id.*

¶ 68 With respect to the prejudice prong, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. Errors by counsel "come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial." *Id.* at 693. "In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." *Harrington v. Richter*, 562 U.S. 86, 111 (2011). Rather, "*Strickland* asks whether it is 'reasonably likely' the result would have been different." *Id.* Like the matter before us, when "a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695.

¶ 69 Additionally, *Strickland* requires the defendant to "affirmatively prove" that prejudice resulted from counsel's errors. *Id.* at 693. "Satisfying the prejudice prong necessitates a showing of factual prejudice, not simply speculation that defendant may have been prejudiced." *People v. Patterson*, 2014 IL 115102, ¶ 81.

21

¶ 70    We review a claim of ineffective assistance of counsel *de novo*. *People v. Hale*, 2013 IL 113140, ¶ 15. On appeal, the defendant speculates that he was improperly convicted of first degree murder because the jury was presented evidence of prior incidents of domestic violence and they did not understand how to properly apply that evidence to the separate charges. When the evidence regarding prior instances of domestic violence was presented, the jury was contemporaneously given a limiting instruction that such evidence was "only to be considered by [them] as to the domestic battery charge." The jury was also instructed at the close of evidence that "[a]ny evidence that was received for a limited purpose should not be considered by you for any other purpose." Further, they were instructed that the propensity evidence "may be considered by you only for that limited purpose." The question from the jury did not co-mingle the domestic battery charge and the first degree murder charge; the question was limited only to domestic battery.

¶ 71    Following a review of the record as a whole, we conclude that the defendant has not affirmatively proven that his convictions of first degree murder and domestic battery would have been different but for the claimed error. Accordingly, we find the defendant received effective assistance of counsel.

¶ 72                                  D. Mistrial

¶ 73    The defendant alleges that the trial court's denial of his motion for mistrial after Kibbons suffered a seizure while testifying as a witness, or failure to take some other remedial action, was an abuse of discretion. "It is within the discretion of the circuit court to determine the propriety of declaring a mistrial." *People v. Redd*, 135 Ill. 2d 252, 323 (1990). A denial of a motion for a mistrial will not be reversed unless the denial was a clear abuse of discretion. *People v. Sims*, 167 Ill. 2d 483, 505 (1995). As explained above, "[a]n abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *Caffey*, 205 Ill. 2d at 89. "Generally, a mistrial should be

22

granted where an error of such gravity has occurred that it has infected the fundamental fairness of the trial, such that continuation of the proceeding would defeat the ends of justice." *People v. Bishop*, 218 Ill. 2d 232, 251 (2006).

¶ 74    In this case, the defendant speculates that the jury could have been sympathetic to Kibbons as a result of his seizure such that they would give his testimony more weight. There is nothing in the record to support this contention. Additionally, the opposite result is just as likely. If a jury observes a witness have a seizure, after he has previously testified to a prior traumatic brain injury and his alcohol consumption, we could speculate that this event would have the opposite effect and the jury would find the witness less credible. Either conclusion is pure speculation.

¶ 75    What we do know is the trial court observed the medical incident and the jurors as the events unfolded. The trial judge "will always be in a better position than a court of review to assess the probable reactions of jurors in a case over which he or she has presided." *People v. Runge*, 234 Ill. 2d 68, 104 (2009) (citing *United States v. Hernandez*, 330 F.3d 964, 990 (7th Cir. 2003)). The trial court's discretion extends to the determination of whether jurors should be questioned about an event. *Id.* at 105.

¶ 76    We cannot say that the trial court's denial of the motion for a mistrial following a witness's medical event was arbitrary, fanciful, or unreasonable. Further, the decision not to make further inquiry regarding the incident was also not an abuse of discretion, as doing so might have caused the jury to consider the incident problematic when they might otherwise not have done so. The trial court made clear factual findings—including that "in less than two minutes the jury was taken out of this courtroom," and that the trial court did not think the jurors "were affected by this at all"—in support of its decision to deny the motion for a mistrial. In light of those factual findings, and our thorough review of the record on appeal, we cannot conclude that no reasonable person

23

would take the view adopted by the trial court. Accordingly, we find no abuse of discretion in the trial court's ruling.

¶ 77                                        III. CONCLUSION

¶ 78    For the foregoing reasons, we affirm the defendant's convictions and sentences.

¶ 79    Affirmed.