NOTICE
Decision filed 05/01/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 240876-U

NO. 5-24-0876

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 17-CF-2618 |
| | ) | |
| STEVEN J. McGAULEY, | ) | Honorable |
| | ) | Amy Maher, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE BARBERIS delivered the judgment of the court.
Justices Boie and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*: We reverse the circuit court's order dismissing defendant's postconviction petition at the first stage of proceedings and remand for second-stage proceedings, where defendant stated the gist of a constitutional claim of ineffective assistance of trial counsel.

¶ 2    On February 21, 2019, a Madison County jury found defendant, Steven J. McGauley, guilty of first degree murder (720 ILCS 5/9-1(a)(1) (West 2016)) and domestic battery (*id.* § 12-3.2(a)(1)), and the Madison County circuit court later sentenced defendant to 1 year in jail for domestic battery and 60 years in prison for murder followed by 3 years of mandatory supervised release (MSR). This court affirmed defendant's conviction and sentences on direct appeal. *People v. McGauley*, 2023 IL App (5th) 190372-U. Defendant subsequently filed a *pro se* petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)). The

1

trial court summarily dismissed defendant's petition at the first stage of the proceedings, finding that defendant's 31 claims were patently without merit and based on indisputably meritless legal theories or fanciful factual allegations. Defendant appeals, arguing that the trial court erred by summarily dismissing his postconviction petition. For the following reasons, we reverse and remand for second-stage postconviction petition proceedings.

¶ 3                                I. Background

¶ 4     We limit our recitation to include only those facts necessary for the disposition of this appeal. On September 28, 2017, a grand jury indicted defendant for domestic battery of his wife, Mary McGauley (720 ILCS 5/12-3.2(a)(1) (West 2016)), a Class A misdemeanor, and for the first degree murder of Steven Flack (*id.* § 9-1(a)(1), (2)), a Class M felony, stemming from events that occurred on September 3, 2017. The Madison County Public Defender briefly represented defendant. On September 6, 2017, the public defender filed a motion for discovery seeking, in part, "[a]ll records or prior criminal convictions, which may be used for impeachment of persons whom the State intends to call as witnesses" and "[a]ll material or information within the possession or control of the State which tends to negate the guilt of the accused."

¶ 5     On September 12, 2017, privately retained defense counsel entered his appearance on behalf of defendant and filed a motion for discovery seeking "[a]ny material information known to the [State] which tends to negate the guilt" of defendant. On June 18, 2018, defense counsel filed notice of defendant's intent to assert the defenses of self-defense and provocation and requested that "all evidence relating to self-defense and provocation be properly admitted." On July 12, 2018, defense counsel filed a motion for supplemental discovery. On August 2, 2018, the State filed supplemental discovery and proof of service indicating they disclosed additional discovery including Flack's criminal history. Flack was convicted of misdemeanor domestic

2

battery twice in January 2004 and once in June 2010. The two 2004 convictions were later vacated and the underlying charges dismissed.

¶ 6     On January 27, 2019, the State filed a motion seeking discovery related to any witnesses or evidence demonstrating Flack's reputation for violence or that Flack was the first aggressor. At a January 31, 2019, pretrial hearing, the trial court instructed both parties that "discovery needs to be complied with by February 8th" and any evidence not disclosed by that time would be excluded. On February 11, 2019, the State filed a motion to bar evidence of Flack's prior bad acts. The State argued, *inter alia*, that on January 27, 2019, it requested any evidence the defense intended to use to show Flack was the initial aggressor and that because the defense did not disclose any such evidence by the February 8, 2019, deadline, any potential evidence should be barred. On February 12, 2019, following the close of *voir dire*, the court heard all pending motions. Regarding its motion to bar evidence of Flack's prior bad acts, the State again argued that it had not received any discovery on the issue prior to the court's February 8, 2019, deadline. Defense counsel responded, "Your Honor, we did not disclose any documents because we have no documents."

¶ 7     On February 12, 2019, defendant's jury trial commenced. Evidence and testimony adduced at trial demonstrated that on Labor Day weekend of 2017, defendant and his wife, Mary, hosted their friends John Paul Kibbons, Steven Flack, and his wife, Leah Flack, at their residence for the duration of the holiday weekend. Kibbons testified that on September 3, 2017, after everyone drank throughout the day, Flack woke Kibbons up from a nap in the basement around 4 p.m. As he ascended the stairs, Kibbons heard a "solid thud" from upstairs. When he emerged into the living room he observed Mary on the floor with defendant's hand in her hair. Flack then said, "[H]e put his hands on her." Mary and defendant separated, and defendant, Flack, and

3

Kibbons went outside to a backyard deck next to a detached garage. Flack and Kibbons sat down at the patio furniture on the deck. Kibbons then testified that defendant walked out from the back door into the yard and started to "threaten" the two men. Kibbons described defendant's demeanor as "horrible" and "frightening, threatening." Kibbons testified that defendant called out to the two men, " 'Come on, come on, both of ya, let's do this, come on out here.' " Flack told defendant, "[Y]ou don't put your hands on a woman." Flack stepped down from the deck and defendant began moving towards Flack. Flack punched defendant about 10 times. Kibbons testified that defendant attempted to punch Flack back but appeared to fail in landing a single strike. Kibbons described Flack as "dominating" like a "swarm of bees." After Flack struck defendant, Flack pushed defendant, and defendant "hit his eye on a four-by-four on a privacy fence." Flack returned to the deck. Defendant walked past everyone and said to Mary, who stood on the deck: " 'Did I do what you thought I was going to do[?]' " Defendant then went into the house. Kibbons further testified that Flack decided to leave following the altercation. After gathering his belongings, Flack returned to the backyard to tell Kibbons goodbye. Defendant then emerged from the house with a revolver in his left hand and looking "like a monster." Defendant immediately raised the gun and shot Flack four times causing Flack to fall to the ground. Kibbons pulled a knife and threatened defendant. Defendant then emptied the spent casings from the revolver to prove it was empty.

¶ 8    Mary testified that she and defendant were married for almost two years and that Flack was her close childhood friend. She acknowledged taking prescription medications, smoking marijuana, and drinking heavily on the day of the incident. She denied that Flack noticed or asked about bruises on her leg on September 3, 2017. She testified that defendant "sometimes" had a temper when drinking. She recounted the events of the day but denied or failed to recall making

4

statements to police that she would testify against defendant because he killed her childhood friend or that Flack attacked defendant and "beat the f*** out" of him.

¶ 9    Leah Flack, Flack's wife, testified that on September 3, 2017, Mary and defendant were talking in a "tense" tone. That night, she exited the home into the backyard with Mary. Defendant followed behind them while yelling and calling out to Flack. Leah "couldn't handle the tone" and returned inside to collect her belongings. She then exited the front of the house and proceeded to pack her belongings in the car. While getting ready to leave in her vehicle, Flack came outside and talked with her briefly. Leah told him they were leaving, so Flack proceeded to collect his belongings from the home. About one minute later, Mary "comes running out, she's flailing and screams, he's got a gun." Leah then heard gunshots. She ran through the house and ultimately saw Flack lying in the backyard. She then ran back to the front yard.

¶ 10    Defendant testified that on September 3, 2017, he woke up around 10:30 a.m. and began drinking with Mary, Kibbons, and Flack. After attending a wake, drinking at a bar, and buying more alcohol at a convenience store, defendant, Mary, and Flack returned home. Defendant testified that, in the living room, Mary attempted a "playful kick" at defendant but fell to the floor because she was drunk. Defendant helped Mary back up and went outside. Defendant told Flack that the bruises and scratches on Mary's legs were from falling. The two men exchanged expletives and defendant asked Flack to leave. Defendant then testified that as he attempted to sit down, Flack whispered his name, spun him around, and punched or struck him in the face. As the fight continued and spilled off the deck and into the yard, Flack "pinned [defendant] up against the fence, and *** inserted his thumb into [defendant's] eye." Once the fight broke off, Flack left the backyard through the walkway between the house and detached garage. Defendant testified that he entered the house looking for Mary and leaving blood drops throughout the house. As

5

defendant searched for Mary, he saw Flack "pacing through the yard" and "look[ing] animated." Defendant testified that after unsuccessfully looking for a phone, he armed himself with a .38-caliber revolver from his bedroom nightstand. Defendant then exited the home into the backyard and again saw Flack. He ordered Flack to leave the property, but Flack put his hands into a "fighting stance" and began taunting defendant. Defendant revealed and raised the handgun, and Flack "walk[ed] straight towards [defendant's] position." Defendant then raised the revolver and fired it.

¶ 11    On February 21, 2019, at the jury instruction conference, the State sought a jury instruction concerning an aggressor's use of force which stated:

> "A person who initially provokes the use of force against himself is justified in the use of force only if the force used against him is so great that he reasonably believes he is [in] imminent danger of death or great bodily harm, and he has exhausted every reasonable means to escape the danger other than the use of force which is likely to cause death or great bodily harm to the other person."

Defense counsel objected to this instruction and argued that "who is the initial aggressor in this case is up to a variety of different interpretations," and that in the defense's view, Flack was the initial aggressor. The State replied, "There is absolutely a question as to who the initial aggressor was and who provoked this, in both fights." The State further argued that including the instruction could help "clarify things for the jury." The trial court stated that "it's a question of fact for the jury" and allowed the instruction. The jury deliberated and found defendant guilty of first degree murder and domestic battery.

¶ 12    The trial court sentenced defendant to 1 year in jail for domestic battery and 60 years in prison for murder followed by 3 years of MSR. On March 6, 2023, this court affirmed defendant's conviction and sentences on direct appeal. *McGauley*, 2023 IL App (5th) 190372-U.

6

¶ 13    On April 3, 2024, defendant filed a 31-point *pro se* petition for relief under the Act. Relevant to this appeal is claim 25, in which defendant alleged ineffective assistance of counsel where trial counsel failed to "submit propensity evidence to show [Flack's] violent character," namely, Flack's domestic battery criminal history. Defendant contended that this failure to submit the evidence "regarding Flack's propensity for violent behavior to show he was the first aggressor, as claimed by [defendant] in a trial where self defense was [defendant's] affirmative defense, could never be considered sound trial strategy." Defendant cited *People v. Lynch*, 104 Ill. 2d 194 (1984), to support his claim, arguing, "When the theory of self-defense is raised, the [victim's] aggressive and violent character is relevant to show who was the aggressor and the defendant may show it by appropriate evidence, regardless of when he learned of it." Defendant noted that trial counsel claimed he did not submit discovery evidence of Flack's prior convictions because he did not have any such documents. Defendant further noted that Flack's criminal history revealed two misdemeanor domestic battery convictions in January 2004 and one in June 2010. Defendant argued that "[w]here Flack's propensity for violence is in question" his trial counsel "[erred] in refusing to submit such evidence that contained such a high degree of relevance to show Flack was the initial aggressor."

¶ 14    On July 1, 2024, the trial court entered a written order summarily dismissing defendant's petition at the first stage of the proceedings, finding that defendant's claims were patently without merit and based on indisputably meritless legal theories or fanciful factual allegations. Regarding claim 25, the court wrote:

> "[Defendant] next complains that trial counsel failed to introduce evidence to show a propensity for violence by Steven Flack (the murder victim). In support, [defendant] attaches to his petition documentation purportedly showing Flack had three prior domestic battery convictions—two in 2004 and one in 2010. However, a review of the supporting documents show that the State had previously dismissed each of Flack's previous domestic battery charges. Thus, [defendant] cannot demonstrate that trial

7

counsel was arguably deficient in failing to introduce Flack's prior domestic battery convictions where no such convictions exist[ ]."

This appeal followed.

¶ 15                                              II. Analysis

¶ 16    On appeal, defendant argues that the trial court erred when it summarily dismissed his *pro se* postconviction petition at the first stage of the proceedings. Specifically, defendant contends he stated the gist of a constitutional claim that trial counsel was ineffective for failing to introduce Flack's prior convictions, where such evidence is "highly probative and admissible" when the identity of the first aggressor is at issue. The State rebuts that defendant did not receive ineffective assistance of counsel where trial counsel's decision not to submit Flack's prior convictions was one of sound trial strategy. The State argues that trial counsel may have wanted to minimize the focus on defendant's own domestic battery charges by not bringing attention to Flack's criminal history. The State further contends that defendant cannot establish that he was prejudiced by any potential ineffective assistance where the evidence overwhelmingly supports that defendant instigated the conflict. We agree with defendant and therefore reverse the first-stage dismissal of defendant's postconviction petition and remand for second-stage proceedings.

¶ 17    As an initial matter, we address forfeiture. The State contends that defendant's ineffective assistance claim is forfeited because defendant should have raised the issue on direct appeal and failed to do so. However, defendant rebuts, and we agree, that the State failed to provide a citation to the record that shows that Flack's criminal history was available to appellate counsel on direct appeal. See *People v. Veach*, 2017 IL 120649, ¶ 47 ("[I]n Illinois, a defendant must generally raise a constitutional claim alleging ineffective assistance of counsel on direct review or risk forfeiting the claim. *** Procedural default does not, however, preclude a defendant from raising an issue on collateral review that depended upon facts not found in the record."). This issue is

8

appropriately raised on collateral review, and therefore not forfeited, where the State has not demonstrated that defendant's appellate counsel had a sufficient basis in the record to raise the issue of ineffective assistance of trial counsel on direct appeal.

¶ 18   The Act provides a method for persons under criminal sentence to assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both. *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). The Act provides a three-step process to resolve a criminal defendant's conviction or sentence that resulted from a violation of rights protected under the state or federal constitution. *People v. York*, 2016 IL App (5th) 130579, ¶ 15. Section 122-2 of the Act requires the postconviction petition "clearly set forth the respects in which petitioner's constitutional rights were violated." 725 ILCS 5/122-2 (West 2020). At the first stage of postconviction proceedings, the court reviews the petition independently and determines whether the petition is frivolous or patently without merit. *York*, 2016 IL App (5th) 130579, ¶ 15. At this stage, the court treats allegations of fact as true so long as those allegations are not affirmatively rebutted by the record. *People v. Bethel*, 2012 IL App (5th) 100330, ¶ 10. A postconviction petition is considered frivolous or patently without merit if the allegations in the petition fail to present the "gist of a constitutional claim," that is, has no arguable basis in either law or fact. *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996); *Hodges*, 234 Ill. 2d at 16. Further, a petition that lacks an arguable basis in either law or fact is one that is based on an indisputably meritless legal theory or fanciful allegations. *Hodges*, 234 Ill. 2d at 16.

¶ 19   A defendant's petition at the first stage need only present a limited amount of detail (*id.* at 9 (citing *People v. Delton*, 227 Ill. 2d 247, 254 (2008); *People v. Torres*, 228 Ill. 2d 382, 394 (2008))), and there is no need to set forth the claim in its entirety or include legal argument or

9

citations to legal authority (*Gaultney*, 174 Ill. 2d at 418). Because most petitions are drafted at the first stage by defendants with little legal knowledge or training, the threshold for survival at this stage is low. *Hodges*, 234 Ill. 2d at 9 (citing *Delton*, 227 Ill. 2d at 254; *Torres*, 228 Ill. 2d at 394). Our review of the trial court's dismissal of defendant's postconviction petition at the first stage is reviewed *de novo*. *People v. Edwards*, 197 Ill. 2d 239, 247 (2001).

¶ 20    As described above, defendant contends he received ineffective assistance of trial counsel where the identity of the initial aggressor was at issue and trial counsel failed to introduce propensity evidence of Flack's prior domestic battery convictions. To prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's conduct fell below an objective standard of reasonableness and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). If defendant fails to prove either prong of the *Strickland* test, his claim for ineffective assistance of counsel must fail. *People v. Sanchez*, 169 Ill. 2d 472, 488 (1996). At the first stage of postconviction proceedings, "a petition alleging ineffective assistance may not be summarily dismissed if (i) it is arguable that counsel's performance fell below an objective standard of reasonableness and (ii) it is arguable that the defendant was prejudiced." *Hodges*, 234 Ill. 2d at 17.

¶ 21    Here, defendant's petition stated the gist of a constitutional claim that he received ineffective assistance of trial counsel. This is not a conclusion as to the merits of this claim, or the other claims presented in defendant's postconviction petition, but rather the survival of defendant's collateral claims over the low threshold set forth in *Hodges*, thus requiring a second-stage proceeding. *Hodges*, 234 Ill. 2d at 9. First, we cannot conclude that defense counsel's failure to submit Flack's criminal history was the result of sound trial strategy. The record shows that on

August 2, 2018, the State filed supplemental discovery and proof of service indicating they disclosed additional discovery including Flack's criminal history. Flack was convicted of misdemeanor domestic battery twice in January 2004 and once in June 2010. The two 2004 convictions were later vacated and the underlying charges dismissed. On February 11, 2019, the State filed a motion to bar evidence of Flack's prior bad acts. On February 12, 2019, following the close of *voir dire*, the court took up pending motions. Regarding its motion to bar evidence of Flack's prior bad acts, the State argued that it had not received any discovery on the issue prior to the trial court's February 8, 2019, discovery deadline. Defense counsel responded, "Your Honor, we did not disclose any documents because we have no documents." At the jury instruction conference, both parties agreed that there was a question as to the identity of the initial aggressor. "[W]hen the theory of self-defense is raised, the victim's aggressive and violent character is relevant to show who was the aggressor, and the defendant may show it by appropriate evidence, regardless of when he learned of it." *Lynch*, 104 Ill. 2d at 200. "Convictions for crimes of violence *** are reasonably reliable evidence of a violent character" for the purpose of proving a victim was the aggressor. *Id.* at 201-02. Here, both parties acknowledge that there is an issue as to who the initial aggressor was. In this instance, Flack's domestic battery convictions could serve as relevant and admissible *Lynch* evidence. However, defense counsel did not submit Flack's criminal history because "we [the defense] have no documents." It is *arguable* that defense counsel's performance fell below an objective standard of reasonableness where counsel failed to submit relevant *Lynch* evidence, despite receiving such discovery, and instead claiming to have no evidence in counsel's possession.

¶ 22    Second, defendant presents an arguable basis of prejudicial ineffective assistance that is not "indisputably meritless," "frivolous," or "patently without merit." *Hodges*, 234 Ill. 2d at 22.

11

Again, we reiterate that, at the first stage of postconviction proceedings, defendants face a low threshold for their claims to survive. *Id.* at 9. The State contends that defendant can only "speculate that the trial court would have allowed him to admit evidence of [Flack's] prior conviction for *Lynch* purposes" and that the evidence "overwhelmingly established that he instigated the conflict." The State itself speculates that the trial court would have exercised its discretion to exclude the *Lynch* evidence as "too remote." We agree with defendant's rebuttal that, in first-stage proceedings, defendant need only establish that it is arguable that the *Lynch* evidence would be admitted and arguable that defense counsel's failure to submit the evidence prejudiced defendant. Where there is a question of the identity of the initial aggressor, as here, it is *arguable* that *Lynch* evidence would be relevant and admissible.

¶ 23    Finally, we agree with defendant that it is *arguable* that submission of Flack's prior domestic battery conviction as *Lynch* evidence could have affected the jury's determination of who the initial aggressor was, and defense counsel's failure to introduce the evidence *arguably* constitutes deficient performance that prejudiced defendant. Trial testimony revealed that defendant and Flack exchanged expletives in the backyard. Kibbons testified that defendant failed to successfully land a single strike in the ensuing physical altercation. Defendant testified that he went inside to search for Mary or a phone. He testified that he saw Flack outside pacing and "look[ing] animated." Defendant testified that he emerged from the house armed with the revolver. He testified that he ordered Flack to leave, but Flack raised his hands, taunted defendant, and walked toward defendant. Defendant testified that he fired after Flack began advancing. Both parties, and the trial court, agreed that the identity of the initial aggressor was a factual issue for the jury's consideration. Therefore, defendant was arguably prejudiced by defense counsel's failure to introduce relevant *Lynch* evidence of Flack's prior domestic battery conviction, which

12

arguably could have affected the jury's determination of who the initial aggressor was. Again, we do not reach the merits of the claim itself. We instead determine whether defendant's claim of ineffective assistance is indisputably meritless, frivolous, or patently without merit. Based on the foregoing, it is not.

¶ 24　　Therefore, we conclude that defendant's petition presented the gist of a constitutional claim. Accordingly, we conclude that the trial court erred by summarily dismissing defendant's *pro se* postconviction petition at the first stage of proceedings.

¶ 25　　　　　　　　　　　　　　III. Conclusion

¶ 26　　For the foregoing reasons, we reverse the order of the circuit court of Madison County, and we remand for second-stage proceedings.

¶ 27　　Reversed and remanded.